FILED

JUN 21 2007

MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| INTEGRATED GLOBAL CONCEPTS, INC., | ) |
| | ) |
| | ) |
| Plaintiff, | ) Civil Action File |
| | ) |
| | ) |
| | ) |
| | ) **JURY TRIAL DEMANDED** |
| | ) |
| | ) |
| v. | ) |
| j2 GLOBAL COMMUNICATIONS, INC., | |
| CATCH CURVE, INC., RICHARD RESSLER, | |
| MICHAEL WILLIAM McLAUGHLIN, IP | |
| INVESTMENTS GROUP, RYAN STRONG, | |
| AUDIOFAX, INC., AUDIOFAX IP LLC, | |
| MARK BLOOMFIELD, DAVID A. KENNEDY, | |
| NEHEMIA ZUCKER, R. SCOTT TURICCHI, | ) |
| STEVEN J. HAMERSLAG, CRA, | ) |
| INTERNATIONAL, IPAC LLC, KEVIN | ) |
| SHULTZ, AND FTI CONSULTING, INC., | ) |
| | ) |
| Defendants. | ) |

07CV3494
JUDGE LINDBERG
MAGISTRATE JUDGE KEYS

**COMPLAINT**

Integrated Global Concepts, Inc. (*"IGC"*), by its attorneys, alleges for its complaint

against Defendants, j2 Global Communications, Inc. (*"j2"*), Catch Curve, Inc. (*"Catch Curve"*),

Richard Ressler (*"Ressler"*), Michael William McLaughlin (*"McLaughlin"*), IP Investments

Group (*"IPIG"*), Ryan Strong (*"Strong"*), AudioFAX, Inc. (*"AudioFAX"*), AudioFAX IP LLC

(*"AudioFAX IP"*), Mark Bloomfield (*"Bloomfield"*), David A. Kennedy (*"Kennedy"*), Nehemia

Zucker (*"Zucker"*), R. Scott Turicchi (*"Turicchi"*), Steven J. Hamerslag (*"Hamerslag"*), CRA

International (*"CRA"*), formerly known as InteCap, Inc., IPAC LLC (*"IPAC"*), Kevin Shultz

(*"Shultz"*), and FTI Consulting, Inc. (*"FTI"*) (collectively the *"Defendants"*), upon knowledge

with respect to its own acts and upon information and belief with respect to all other matters, as follows:

## SUMMARY OF THE COMPLAINT

1.    This is an action for antitrust and other violations against all the named defendants. j2 is the dominant provider of Internet facsimile services which deliver fax messages via the Internet to home and small offices (which is the *"Relevant Product Market"*) in the United States (the *"Relevant Geographical Market"*). Catch Curve, the current titleholder of certain patents, is one of j2's accomplices in a campaign to restrict trade and eliminate all of j2's competitors. IPIG and its "predecessors" CRA and IPAC, licensing companies attempting to locate licensees for the j2 and Catch Curve patents, are key facilitators of the conspiracy. McLaughlin and Strong, principals and/or employees of Catch Curve, IPIG, IPAC, and CRA, conspired with the other Defendants and have initiated and implemented the fraudulent plan of, and conspiracy for, enforcing fraudulently obtained patents to unlawfully create and maintain a monopoly by intimidation against j2's competitors, including IGC, beginning prior to the year 2004 and continuing through today.

2.    The Relevant Product Market is Internet facsimile services provided to home offices and small offices. Companies competing in this market provide individuals and small businesses, for a fee, with facsimile numbers and server functions that allow users to send facsimile messages directly from their computers (typically through fax cards or systems), and to receive fax messages directly to their computers in the form of attachments to e-mails.

3.    j2 and IGC offer services in the Relevant Product Market to customers throughout the United States. The Relevant Geographic Market is the fifty (50) states of the United States, plus the District of Columbia and Puerto Rico. The Relevant Product Market and Relevant Geographic Market are, together, the Relevant Markets.

2

4.     Defendant j2 has in excess of 90 percent share of the Relevant Markets.

5.     j2 competes in the Relevant Markets under, among others, the brand eFAX. eFAX is by far the dominant brand of Internet facsimile services available in the United States today. Defendants targeted IGC and other j2 competitors in the Relevant Markets with a scheme to crush competition, raise their costs of operation, eliminate them as competitors in the Relevant Markets entirely, and substantially raise the cost of fax to e-mail services to consumers.

6.     j2 plans to remain the dominant provider, not by offering a better, more attractive service at a competitive price, but by waging a campaign of acquisitions, extortion, and sham litigation designed to raise its rivals' costs and prevent them from offering competitive services altogether. j2 has accomplished this goal through its own efforts and through the efforts of the other defendants through a collaborative plan with its co-conspirators and all of the co-defendants.

7.     j2, Catch Curve, the present and former executive officers of j2, Ressler, Zucker, Hamerslag, Turicchi, and Defendants AudioFAX, Bloomfield, Kennedy, McLaughlin, Strong, IPAC, IPIG, CRA, Shultz, and FTI have within the past four years undertaken and accomplished a series of consolidations and acquisitions of competitors, assets of competitors, and patents from various businesses as part of their anticompetitive scheme. j2 also owns several patents which it fraudulently procured within the past four years and which it claims cover the Relevant Markets through the mailing of fraudulent documents through the United States Postal Service ("USPS") to the United States Patent and Trademark Office ("USPTO").

8.     Most recently, j2 and the other defendants have within the past four years waged a fraudulent and vicious campaign to intimidate providers of Internet facsimile services into paying money to j2 and/or Catch Curve for licenses of patents that the defendants know do not cover the competitors' activities but to achieve a settlement which costs less than litigating the

3

issues. j2, Catch Curve, AudioFAX, Bloomberg, Kennedy, McLaughlin, Strong, IPIG, IPAC, CRA, FTI and their employees each have internal documents explaining in detail why j2's competitors do not infringe the patents. When competitors, such as IGC and others, refuse to capitulate to this extortion, Catch Curve and j2 or the previous patent owners file sham lawsuits for patent infringement that are objectively baseless in that any reasonable litigant or reasonable person would know that the competitors' activities do not infringe the patents asserted. Recently, the United States District Court for the Central District of California confirmed that the claims of the patents being asserted by Catch Curve are not infringed by j2's competitors.

9.    Co-conspirators Catch Curve, and its predecessor in interest AudioFAX, have within the past four years filed numerous lawsuits in the United States District Court for the Northern District of Georgia, where most of the named competitors therein, including IGC, are not even subject to personal jurisdiction, merely to increase the cost of defense of litigation to those defendants and thereby to force settlements. AudioFAX created a separate, wholly-owned entity, AudioFAX IP, which it used as a party to the litigation. All of the competitors that have recently settled will testify that they did not infringe any of Defendants' patents, but settled only to avoid the high costs of litigation. j2 and Catch Curve have often timed the filing of their sham infringement actions in order to prevent j2's competitors in the Relevant Markets from consummating contracts with major potential customers, acquisitions, and/or stock offerings that would boost their efficiency and competitiveness and allow lower prices to consumers.

10.    As a result of the above actions and tactics, j2 has come to dominate the Relevant Markets with a market share exceeding 90 percent. The Defendants have wrongfully raised the costs of their rivals, including IGC, through fraud, intimidation, litigation, and interference with their reasonable business expectancies and, in so doing, have prevented j2's competitors from

4

offering better, more innovative services to consumers at prices that would reflect a fully competitive market.

JURISDICTION AND VENUE

11. This Court has jurisdiction over the claim for relief arising under the Clayton Act (Count I) pursuant to 15 U.S.C. § 22 since each Defendant is a co-conspirator in a scheme being actively pursued by each of them in this state and in this district that has resulted in tortious injury to IGC, a resident of this state. In addition, each defendant has purposely established contacts and transacts business in this state and in this district. This Court has jurisdiction over these claims for relief arising under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961 et seq. (Count II), pursuant to 18 U.S.C. §§ 1964 and 1965. This Court has jurisdiction over the claims for relief arising under the Sherman Act, 15 U.S.C. §§ 1 and 2 (Count III through VII), pursuant to 15 U.S.C. § 4 and 28 U.S.C. §§ 1331 and 1337. This Court has supplemental jurisdiction over the remaining claims for relief arising under state law (Counts VIII through XV) pursuant to 28 U.S.C. § 1367. All claims were discovered by IGC within the past four years, as on and after the date when IGC was first sued in Georgia for patent infringement, and could not have been reasonably discovered sooner.

12. Venue is proper in this district pursuant to 15 U.S.C. §§ 15 and 22, 18 U.S.C. § 1965 and 28 U.S.C. § 1391 because each of the Defendants is transacting and doing business and conducting or otherwise transacting their affairs in this district. The Defendants are each co-conspirators and have performed acts in furtherance of their illegal and wrongful conduct alleged in this Complaint in this state which have had substantial damaging effects in this district, and a substantial part of the events giving rise to the claims in this action occurred in this district. Each of the Defendants has contacted IGC's website in Chicago scores or even hundreds of times.

## PARTIES

13.     Plaintiff IGC is a corporation organized under the laws of the State of Illinois with its principal place of business at 1501 N. Cleveland, 1F, Chicago, Illinois 60610. IGC provides Internet facsimile services to its customers in the Relevant Markets.

14.     Defendant j2 is a corporation organized under the laws of the State of Delaware with its principal place of business at 6922 Hollywood Boulevard, Suite 500, Los Angeles, California, 90028. j2 provides Internet facsimile services and communications services to individuals and businesses in the Relevant Markets. j2 offers these services under brand names including eFax, eFax Corporate, eFax Broadcast, jConnect, Onebox, Electric Mail, eVoice, PaperMaster, Consensus, M4Internet, Protofax, and jBlast. j2 claims that as of April 26, 2006, it had a portfolio of more than 30 issued U.S. patents and numerous other pending patent applications.

15.     Defendant Catch Curve is a corporation organized under the laws of the State of Delaware with its principal place of business at Atlantic Center Plaza, Suite 2400, 1180 W. Peachtree Street NE, Atlanta, Georgia 30309. Catch Curve was incorporated in January 2005 to acquire the assets of AudioFAX to aid in j2's efforts to: 1) illegally interfere with the business of j2's competitors in the Relevant Markets; and 2) illegally obtain and maintain j2's monopoly power within the Relevant Markets.

16.     Defendant Ressler is currently the Chairman of the Board of j2 having previously served as the President of the Company, after he was installed by a private equity fund he controlled, from 1997 to 2000. During this period Ressler orchestrated, with the other j2 officers and outside consultants, the purchase of many competitors, including eFax, j2's largest competitor at the time. Since becoming chairman Ressler has actively managed the scheme in concert with the other Defendants to achieve and maintain j2's monopoly in the Relevant

6

Markets. Ressler is a resident of California, having a residence or place of business at 6922 Hollywood Boulevard, Suite 500, Los Angeles, California, 90028.

17.     Defendant McLaughlin is currently the President of Catch Curve. McLaughlin is a co-conspirator in a scheme being actively pursued in this state that has resulted in tortious injury to IGC and transacts business in this state. McLaughlin is a resident of Georgia, having a residence or place of business at Atlantic Center Plaza, Suite 2400, 1180 W. Peachtree Street NE, Atlanta, Georgia 30309.

18.     Defendant IPIG is a business organized under the laws of the State of Georgia and having principal offices at The Biltmore, Suite 205, 817 West Peachtree Street NW, Atlanta, Georgia 30368. IPIG is a co-conspirator in a scheme being actively pursued in this state that has resulted in tortious injury to IGC and transacts business in this state.

19.     Defendant Strong is an officer or principal of IPIG and he is a co-conspirator in a scheme being actively pursued in this state that has resulted in tortious injury to IGC and transacts business in this state. Strong is a resident of Georgia, having a residence or place of business at The Biltmore, Suite 205, 817 West Peachtree Street NW, Atlanta, Georgia 30368.

20.     Defendant AudioFAX, a corporation formed under the laws of the State of Georgia, having a principal place of business at 1640 Powers Ferry Road, Marietta, Georgia, is the former owner of the *"AudioFAX Patents"* described in Paragraph 43 below. AudioFAX is a co-conspirator in a scheme being actively pursued in this state that has resulted in tortious injury to IGC and transacts business in this state.

21.     Defendant AudioFAX IP is a limited liability company formed under the laws of the State of Georgia, having a principal place of business at 1640 Powers Ferry Road, Marietta, Georgia. AudioFAX IP is a co-conspirator in a scheme being actively pursued in this state that has resulted in tortious injury to IGC and transacts business in this state.

22.    Defendant Bloomfield, a resident of Florida, having a residence at 697 Ponte Vedra Blvd, Ponte Vedra Beach, Florida, was an officer and principal in AudioFAX and AudioFAX IP during the time periods pertinent hereto.  Bloomfield is a co-conspirator in a scheme being actively pursued in this state that has resulted in tortious injury to IGC and transacts business in this state.

23.    Defendant IPAC is a corporation formed under the laws of the State of Georgia, having a principal place of business at Atlantic Center Plaza, Suite 2400, 1180 W. Peachtree Street NE, Atlanta, Georgia 30309.  IPAC is a co-conspirator in a scheme being actively pursued in this state that has resulted in tortious injury to IGC and transacts business in this state.

24.    Defendant Kennedy is the founder and a principal of IPAC, having a principal place of business at Atlantic Center Plaza, Suite 2400, 1180 W. Peachtree Street NE, Atlanta, Georgia 30309.  Kennedy is a co-conspirator in a scheme being actively pursued in this state that has resulted in tortious injury to IGC and transacts business in this state.

25.    Defendant Zucker is the current Co-President and Chief Operating Officer of j2 and he is a co-conspirator in a scheme being actively pursued in this state that has resulted in tortious injury to IGC and transacts business in this state.  Zucker is a resident of California, having a residence or place of business at 6922 Hollywood Boulevard, Suite 500, Los Angeles, California 90028.

26.    Defendant Turicchi is the current Co-President of j2 and he is a co-conspirator in a scheme being actively pursued in this state that has resulted in tortious injury to IGC and transacts business in this state.  Turicchi is a resident of California, having a residence or place of business at 6922 Hollywood Boulevard, Suite 500, Los Angeles, California 90028.

27.    Defendant Hamerslag is the former CEO and President of jFax, the predecessor of j2 Global Corporation.  Hamerslag is a resident of California, having a residence or place of

business at 2010 Main Street, Suite 600, Irvine, California. Hamerslag is a co-conspirator in a scheme being actively pursued in this state that has resulted in tortious injury to IGC and transacts business in this state.

28.    Defendant FTI is a corporation organized under the laws of the State of Maryland with a place of business located at 333 West Wacker Drive, Chicago, Illinois, in this district. FTI has advised Defendant j2 and the other defendants and has conspired with Ressler, Zucker, and others, and has actively and knowingly engaged in a scheme being actively pursued in this state with the other Defendants designed to achieve anticompetitive ends.

29.    Defendant Shultz is an employee of Defendant FTI and has advised Defendant j2 on its acquisition strategy to create a monopoly in the Relevant Markets. Schultz is a resident of California, having a residence or place of business at 633 West 5th Street, Suite 1600, Los Angeles, California 90071-2027.

30.    Defendant CRA is a Massachusetts corporation and antitrust advisor, with a place of business located at 101 North Wacker Drive, Chicago, Illinois, in this district. CRA has employed McLaughlin and Strong in its InteCap Inc. division at 1360 Peachtree Street NE, Suite 800 in Atlanta, Georgia, which it acquired effective April 30, 2004. CRA has acted as an independent antitrust consultant to j2 and assisted in the development of a scheme for j2 to acquire its competitors and eliminate competition through sham patent litigation. CRA is a co-conspirator in a scheme being actively pursued in this state that has resulted in tortious injury to IGC and transacts business in this state.

### BACKGROUND ALLEGATIONS

31.    This is an action to recover monetary damages of Seventy Million Dollars ($70,000,000.00) and obtain injunctive relief based upon the illegal, anticompetitive, monopolistic and other illegal activities of the Defendants. Defendants are monopolists and

9

patent trolls, have acquired and now maintain their monopoly in the Relevant Markets through illegal, exclusionary, and anticompetitive means in violation of Sections 1 and 2 of the Sherman Act, Section 7 of the Clayton Act, the RICO Act, the Illinois Antitrust and Unfair Competition Statutes, the Illinois Consumer Fraud and Deceptive Business Practices Act, and Illinois common law. Defendants have violated and continue to violate federal and state antitrust laws, state unfair competition laws and state common law with the intent to monopolize the Relevant Markets and to harm competition, all to the detriment of manufacturers, distributors, vendors, operators, and customers of the services in the Relevant Markets. Defendants have engaged in a series of exclusionary and anticompetitive acts and strategies in the United States and this District designed to increase the cost of doing business for their rivals, raise barriers to entry and to expansion, and otherwise to entrench themselves as monopolists, injuring the competitive process and consumers. Because of Defendants' anticompetitive and exclusionary conduct, IGC and other Internet fax service providers have been delayed, prevented, and hindered in competing against Defendants, to the detriment of consumers.

32.     The Defendants have engaged in an illegal scheme to unfairly compete with IGC and others in the Relevant Markets. Defendants have violated the antitrust laws of the United States including the Sherman and Clayton Acts, the RICO laws of the United States, the Antitrust and Unfair Competition laws of the State of Illinois, and the Deceptive and Unfair Trade Practices Act of the State of Illinois, among other things. In addition, j2 has breached its Software License Agreement with IGC. In furtherance of their scheme, the Defendants have conspired among themselves and with others and have:

A.     Obtained control of patents described herein to illegally restrain trade and seek to eliminate all competition in the Relevant Markets by:

10

  i.  Using and controlling AudioFAX and AudioFAX IP to acquire the AudioFAX Patents (described in Paragraph 43) from the alleged inventors;

  ii.  Using AudioFAX and AudioFAX IP to illegally extend the life of the patents-in-suit by fraudulently filing and prosecuting continuation and continuation-in-part applications for patent; and

  iii.  Contorting the alleged invention on telephony (Circuit-Switched Network) transmission and sending of facsimile data in an attempt to cover non–telephony (Packet-Switched Network) transmission, for sending and receiving fax data over the Internet;

  B.  Created a new corporation, Catch Curve, while illegally and fraudulently hiding j2's 100% ownership interest in Catch Curve from j2 shareholders and the SEC;

  C.  Intimidated competitors in the Relevant Markets by sham litigation and by threatening to sue competitors of j2 although those competitors do not infringe any of the patent claims;

  D.  Acquired competitors in violation of § 7 of the Clayton Act;

  E.  Committed fraud on the USPTO with the intent to deceive by applying for and obtaining invalid patents to be asserted against their competitors and by refusing to cite highly relevant and material prior art, provided to them by IGC, to the USPTO with the intent to deceive the USPTO;

  F.  Harassed competitors, including IGC, in the Relevant Markets with patent infringement litigation over patents that Defendants know are invalid, not infringed, and obtained by fraud;

G. Violated the Racketeer Influenced and Corrupt Organizations Act ("*RICO*"), 18 U.S.C. § 1962 *et seq.*, by engaging in an enterprise affecting interstate commerce, the sole purpose of which enterprise was and is to illegally and fraudulently put competitors out of business;

H. Tortiously interfered with the business relations of IGC and others through a campaign of threats and intimidation based upon invalid and fraudulently procured patents, all in order to further erode competition and gain market share in the Relevant Markets;

I. Disseminated false information to the industry and the USPTO as it relates to the validity and applicability of Defendants' patents;

J. Engaged in other unfair, anticompetitive and illegal actions as described herein; and

K. Breached j2's Software License with IGC.

**Internet Facsimile History**

33. During the 1980s, the transfer of documents by facsimile became commercially successful. Transmission of documents by facsimile required the sender to have a fax machine connected to an ordinary telephone line and a recipient to also have a standard fax machine, which was also connected to a standard telephone line. In order to send a fax, the sender merely dialed the phone number of the recipient's fax machine, and the scanned image was sent over the public circuit-switched telephone network to the recipient's fax machine, where it was printed out. This type of fax delivery became known as Fax-to-Fax technology.

34. In the mid-1980s, several Japanese companies introduced more sophisticated fax machines with advanced capabilities. Panasonic began selling its UF-250 and UF-270 models utilizing Group III facsimile protocol and included a storage feature which would "store" a

document if the recipient machine was "busy" and send it later when the line became free. Also, in 1983 the Panamail System (Fax Mailing System) was introduced. The Panamail System provided a "store and forward" system between the transmitting facsimile machine and the receiving facsimile machine and was designed to receive and transmit using the Group III facsimile protocol.

35.     In September of 1988, the alleged inventors of the AudioFAX Patents (described in Paragraph 43) filed a first patent application claiming to have invented a "store and forward facility" for embedding in the public switched telephone network to receive and store facsimile data when the recipient's fax machine was in use or "busy." Once a recipient's fax machine was no longer busy, the store and forward facility would redial the recipient's fax machine number and send the stored data to it over the switched telephone network.

36.     At the time the first application for patent was filed, the inventors did not conceive of any other method of transmitting facsimile data except over a public switched telephone network. This was because standard facsimile machines only worked by connecting them directly to one another over ordinary telephone lines, and, as a result, the inventors limited the disclosure and the scope of protection of any patent to issue on the alleged invention to the sending and receiving of facsimile data over switched telephone networks using facsimile protocol. The inventors have admitted that they did not conceive of any other method of transmitting the facsimile data except using facsimile protocol over a public switched telephone network, and, in particular, did not conceive of transmitting facsimile data over a packet–switched network.

37.     Unknown to the alleged inventors was the prior development and public use in the United States of a totally different and unique public packet-switched network, the ARPANET, in 1969, which is now known as the Internet. The Internet was initially primarily used by

13

military and educational institutions from the early 70s through the 1980s. In 1972, researchers in the United States and other countries began to develop additional computer-based systems for communication over the Internet. Standard fax machines could not and still cannot communicate with one another over this packet-switched network of the Internet.

38.     In 1979, IBM created and introduced in the United States a "store and forward" network that was used for e-mail and listservs for use on a packet-switched network.

39.     In the early 1980s, other companies and researchers in the United States developed computer-based systems that incorporated the store and forward developments of IBM, so that facsimile data could be sent over the Internet and stored if necessary and then forwarded on to a recipient's computer. Thereafter, Internet facsimile services developed computer-based systems whereby their customers could utilize a standard fax machine to transmit a facsimile to an Internet facsimile service, which in turn converted the documents into data files, stored them, and then forwarded them to their customers' e-mail addresses over the Internet using the TCP/IP protocol of this packet-switched network. Since the Internet facsimile services do not transmit or send the facsimile data to their customers over the public switched telephone network as required by every claim of the patents in the AudioFAX Patents, none of their products or services, including IGC's, infringe any of the claims of the patents. All of these developments using store and forward technologies on the Internet were publicly known in the United States for many years and certainly more than a year before the first AudioFAX Patent was filed in 1988.

40.     These Internet facsimile services enable a consumer connected to the Internet to receive a fax document as an attachment to an email, obviating the need for a telephone line or traditional fax machine. j2 now dominates the Relevant Markets with a market share of over

90%. Therefore, customers desirous of these services have little choice when selecting an Internet facsimile service.

41.     As a result of its illegally acquired and maintained market dominance, j2 has been able to charge artificially high prices for its services (which were recently increased by another $4 per month for individuals) in these markets and has precluded new competitive offerings to consumers. The Defendants have damaged consumers by attempting to eliminate competition and by quashing innovation in the Relevant Markets with costly, sham patent infringement lawsuits based on invalid, non-infringed, or unenforceable patents.

## Patents

42.     Defendant Bloomfield allegedly created some technology to deliver faxes over the Internet but he could not obtain broad patent protection, since the concept was not new. When he learned that F-Mail Associates had obtained some earlier patents relating to Fax-to-Fax technology, he purchased the three patents from F-Mail. However, Bloomfield knew that Fax–to–Fax over telephone lines was a waning technology because of newer forms of communication, like e-mail, so he decided to attempt to augment the patents by filing continuing applications in an attempt to expand them to cover the Fax-to-email industry, which was not conceived by the inventors. He knew the patents did not cover this technology, so he called in Kennedy, an intellectual property consultant and co-founder of InteCap Inc., to assist. Together, they decided to file and prosecute fraudulent patent applications with the intent to deceive the USPTO.

43.     Together, Bloomfield and Kennedy filed additional applications and developed the following patent portfolio (the *"AudioFAX Patents"*), consisting of five patents:

A.    Patent No. 6,785,021 (the "'021 Patent"), entitled "Facsimile Telecommunications System and Method," issued to Richard J. Gordon and James R. Kennedy on August 31, 2004;

B.    U.S. Patent No. 6,643,034 (the "'034 Patent"), entitled "Facsimile Telecommunications System and Method," issued to Richard J. Gordon and James R. Kennedy on November 4, 2003;

C.    U.S. Patent No. 5,459,584 (the "'584 Patent"), entitled "Facsimile Telecommunications System and Method," issued to Richard J. Gordon and James R. Kennedy on October 17, 1995;

D.    U.S. Patent No. 5,291,302 (the "'302 Patent"), entitled "Facsimile Telecommunications System and Method," issued to Richard J. Gordon and James R. Kennedy on March 1, 1994; and

E.    U.S. Patent No. 4,994,926 (the "'926 Patent"), entitled "Facsimile Telecommunications System and Method," issued to Richard J. Gordon and James R. Kennedy on February 19, 1991.

44.    Then, instead of immediately threatening companies in the Relevant Markets with litigation, Bloomfield and Kennedy, through AudioFAX, AudioFAX IP, and IPAC, initially attempted to convince j2's competitors to participate in a friendly licensing program, but would then bring litigation if they refused. Bloomfield instructed the AudioFAX attorneys to file numerous additional fraudulent patent applications with the USPTO and, in conjunction with CRA, pursued many of j2's competitors that they knew were not infringing any of these patents.

45. Bloomfield, Kennedy, CRA, McLaughlin, Strong, IPAC, and AudioFAX, and now Catch Curve, j2, Ressler, Zucker, Turicchi, Hamerslag, Schultz, IPIG and FTI, have refused to cite to the USPTO the highly relevant and material prior art references provided to them by IGC. The Defendants did not inform the USPTO of this prior art, knowing that the USPTO would reject their pending applications based on the disclosures in the prior art. This prior art included the Panafax Systems and Panamail Systems from the early- and mid-1980s. In June of 2003, IGC provided to the Defendants information about the UF-250 and UF-270 Panasonic Fax machines with store and forward capabilities sold in Japan and the United States more than one year before the earliest of the AudioFAX Patents was filed. Strong contacted IGC in Chicago and informed IGC that the Defendants would not make the USPTO aware of this prior art and, in fact, they did not cite it during the prosecution of the '021 patent. In addition, the Defendants were also aware of the 1983 Panamail UX4800 HV System and the UF-650 fax machines with store-and-forward capabilities and wilfully did not cite them to the USPTO with the intent to deceive. The User Manuals and Service Manuals for these fax machines disclosed or made very obvious every feature of the alleged inventions claimed in the AudioFAX Patents. The Defendants' actions constitute fraud on the USPTO, as they were done with the intent to deceive the USPTO, and they succeeded. Each of the Defendants willfully utilized the U.S. mails to carry out their scheme to defraud the USPTO in violation of 18 U.S.C. § 1341.

46. In 2004, Bloomfield, Kennedy, McLaughlin, and Strong decided to structure a new relationship with j2 whereby defendant Catch Curve was established to nominally hold title to the AudioFAX Patents while sharing with these others income from licensing of the patents and litigation settlements. The financial structure of Catch Curve (with its "partners"

17

Bloomfield and McLaughlin) is such that it does not share a unity of interest with j2 or any other Defendant.

47. More recently, Bloomfield, Kennedy, McLaughlin, and Strong have conspired with j2 and Defendants Ressler, Zucker, Turicchi, FTI, Schultz, and Catch Curve to file and prosecute additional fraudulent patent applications with the intent to deceive the USPTO and to assist in the creation and maintenance of j2's monopoly by pursuing an anticompetitive, fraudulent scheme to intimidate j2's competitors to either enter into license agreements for the AudioFAX Patents or sell out to j2, all while knowing the patents to be invalid, not infringed, and unenforceable for having been obtained by fraud on the USPTO.

48. Bloomfield and AudioFAX set up AudioFAX IP to implement a licensing program in the Fax-to-Fax industry. Bloomfield, Kennedy, McLaughlin, and Strong conspired to file and prosecute additional fraudulent patent applications based on the original AudioFAX Patents, with the intent to deceive the USPTO. Bloomfield, Kennedy, McLaughlin, and Strong used AudioFAX IP to convince j2's competitors to participate in a licensing program, and would bring litigation if any competitor refused. More recently, AudioFAX, AudioFAX IP, Bloomfield, Kennedy, McLaughlin, and Strong have conspired with j2 and Ressler, Zucker, Turicchi, FTI, Schultz, and Catch Curve to file and prosecute the additional fraudulent patent applications with the intent to deceive the USPTO and assist in the creation of j2's monopoly by pursuing an anticompetitive, fraudulent scheme to intimidate j2's competitors to either enter into license agreements for the AudioFAX Patents or sell out to j2, all while knowing the patents to be invalid, not infringed, and unenforceable for having been obtained by fraud on the USPTO.

49. IPAC obtained the services of Kennedy, McLaughlin, and Strong to pursue the conspiracy complained of herein to eliminate all of j2 competitors, and it continues to actively

18

and knowingly engage in such scheme with the other Defendants to achieve anticompetitive ends. IPAC, McLaughlin, and Strong have conspired with j2 and Ressler, Zucker, Turicchi, FTI, Schultz, and Catch Curve to file and prosecute fraudulent patent applications with the intent to deceive the USPTO and assist in the creation of j2's monopoly by pursuing an anticompetitive, fraudulent scheme to intimidate j2's competitors to enter into license agreements for the AudioFAX Patents, while knowing the patents to be invalid, not infringed and unenforceable for having been obtained by fraud on the USPTO.

50.    j2 conspired with McLaughlin, Strong, and Schultz to further the scheme to eliminate all of j2's competitors, and they continued to actively and knowingly engage in such scheme with the other Defendants to achieve anticompetitive ends. j2, McLaughlin, and Strong have conspired with Ressler, Zucker, Turicchi, FTI, and Catch Curve to file and prosecute fraudulent patent applications with the intent to deceive the USPTO and assist in the creation of j2's monopoly by pursuing an anticompetitive, fraudulent scheme to intimidate j2's competitors to enter into license agreements for the AudioFAX Patents, while knowing the patents to be invalid, not infringed, and unenforceable for having been obtained by fraud on the USPTO.

51.    j2 has obtained a number of patents in order to foreclose or hinder competition with it in the Relevant Markets. It committed fraud on the USPTO in applying for some of these patents. In fact, two of j2's patents are currently being reexamined by the USPTO because of the existence of prior art that was known by j2 but not properly disclosed by j2 to the USPTO examiner during prosecution of the application for those patents. j2 acted with the intent to defraud the USPTO, and its fraudulent motives render the patents unenforceable.

52.    j2 filed applications in 1997 and 1998 that ultimately matured into United States Patent Nos. 6,208,638 (the "*'638 patent*") and 6,597,688 (the "*'688 patent*"), respectively. The initial claims on the application for the '688 patent were rejected by the USPTO, and j2

cancelled all of the claims in favor of claims having claim limitations that ultimately issued as part of the '688 patent.

53.     The USPTO rejected several of the newly added claims of the application for the '688 patent because the specification of the application did not support them as required by 35 U.S.C. § 112, first paragraph. J2 conceded that the specification of the application lacked the required support but asserted that an attached appendix containing the specification of the '638 patent provided the required support. The '638 patent and the application that matured into the '688 patent, however, did not share common inventors, and j2 knew this when it made its assertion of support to the USPTO. Therefore, j2 knew that the '638 patent was prior art to the '688 patent under 35 U.S.C. § 102(e). Nevertheless, j2 still advanced an argument of patentability even though it knew that the claims of the application giving rise to the '688 patent were facially invalid based on the teachings of the '638 patent. The USPTO relied upon j2's fraud in issuing the '688 patent.

54.     j2 also committed fraud on the USPTO in obtaining the '638 patent. j2 advanced claims of patentability while knowing that relevant prior art expressly taught each and every element of one or more claims of the patent application. Specifically, the inventors of the '638 patent worked with fax server boards sold and marketed under the brand names Brooktrout, Gammalink, and/or Dialogic prior to the filing of the application for the '638 patent, yet failed to disclose the functionality of these fax server boards to the USPTO. Each of the fax server boards incorporated functionality that directly anticipated at least one of the independent claims of the '638 patent. The USPTO relied upon j2's fraudulent misrepresentations and omissions resulting in the issuance of the '638 patent.

55.     Aware of the invalidity and unenforceability of the '638 and '688 patents, j2 sought additional patents to assert against its competitors in the Relevant Markets. To that end,

j2 purchased a portfolio of patents from NetOffice Solutions, Inc. -- the *"Bobo patents"*-- in 2004. These included, in part, U.S. Patent Nos. 6,350,066 (the *"'066 patent"*) and 6,564,321 (the *"'321 patent"*). j2 has begun to assert these patents against its competitors in the Relevant Markets in a campaign to obtain and maintain its dominant market share in the Relevant Markets.

56.     Finding itself still without a reliable portfolio of patents to wield against its competitors, j2 acted quickly and surreptitiously to continue its scheme, and it began a conspiracy with others to maintain its dominant market position. In 2005, j2, Bloomfield, Ressler, Zucker, Turrichi, AudioFAX, McLaughlin, IPIG, and Strong created Catch Curve without disclosing its creation to j2's shareholders or to the SEC in its public filings. Catch Curve then acquired a patent portfolio, known as the AudioFAX Patents, that, according to a press release announcing the acquisition, covers "a range of inventions that incorporate fax store--and-forward technologies."

## j2's History of Fraud and Purchase of eFax

57.     Previously, in 1999, the then-owner of the AudioFAX Patents sued jFax.com, Inc. (*"jFax"*), the predecessor to j2, for infringement, asserting that the jFax Internet facsimile service (fax to e-mail) infringed the patents. jFax counterclaimed, alleging that all of the AudioFAX Patents were invalid and were not infringed by the jFax Internet fax service. In particular, Ressler, Hamerslag, Zucker, and Turrichi asserted that the AudioFAX Patents were invalid and were not infringed by j2 based on their internal investigation and documents showing that the AudioFAX Patents were limited to Fax-to-Fax systems using telephone lines to deliver facsimiles and did not cover the Internet delivery systems of the Internet facsimile services. These Defendants refer to the AudioFAX Patents as "FAX-to-FAX Patents" since they do not cover Internet facsimile services.

58. In 2000, Defendant j2's predecessor jFax sought to acquire a competitor at that time known as eFax.com. eFax.com ("eFax") had previously entered into a co-location agreement with IGC, whereby IGC would perform many of the "backroom operations" for eFax. eFax provided Internet facsimile services under the eFax brand, and IGC, in accordance with its contract with eFax, would receive facsimiles from eFax customers and, using its own systems, would convert them to data files which would be thereafter transmitted to the e-mail addresses of the eFax customers as an attachment.

59. jFax was desirous of terminating the co-location agreement between IGC and eFax after its acquisition of eFax. In addition, jFax wanted to accomplish a smooth transition of the eFax customer base and the services being provided by IGC in the year 2000 and before. Therefore, jFax negotiated with IGC and entered into an agreement to transfer the service capabilities and further fulfill all of the obligations of the agreements that eFax owed to IGC. As part of these negotiations, jFax entered into a Software License Agreement ("Software License") with IGC on June 30, 2000, whereby it warranted to IGC that none of the systems and software being used by IGC infringed any patents of which jFax was aware. However, at the time the Agreement was executed, jFax was a defendant as against alleged infringement of the AudioFAX Patents and was therefore well aware of the existence of those patents. Therefore, j2's predecessor jFax has provided to IGC a warranty, which j2 has assumed, stating that IGC's activities did not and do not infringe the AudioFAX Patents. By causing Catch Curve to file a patent lawsuit alleging that IGC infringes the AudioFAX Patents, j2 has breached the Software License.

60. In 2001, the AudioFAX litigation with jFax was settled. Thereafter, Defendants j2, McLaughlin, Strong, Ressler, Zucker, Hamerslag, Turicchi, FTI, and Schultz organized an even more aggressive litigation scheme, which is now being vigorously pursued by all the

Defendants. In accordance with this conspiracy, the Defendants agreed that j2 would nominally acquire title to the AudioFAX Patents and use them, in addition to patents already owned by j2, to quash competition by suing j2 competitors, even though they did not infringe the patents, since the competitors would not have the resources to deal with such sham patent litigation.

61.     Thereafter, in furtherance of the conspiracy in January of 2005, j2 created Catch Curve and directed it to use patent litigation to eliminate competition in the Relevant Markets. j2 created Catch Curve to acquire the AudioFAX Patents without drawing shareholder and public attention to its illegal scheme. j2 intentionally did not disclose its creation of Catch Curve to its shareholders or to federal regulators in its public SEC filings.

62.     In February of 2005, Catch Curve acquired title to the AudioFAX Patents.

### Catch Curve's and j2's Licensing and Litigation Scheme

63.     Catch Curve is not an operating company. It functions solely as a "patent troll," filing lawsuits against Internet service providers that compete with j2 but refuse to purchase a license to use the Catch Curve patents. Since its creation in 2005, Catch Curve has held no additional patents that represent innovation or new inventions. It exists solely to extract money from j2's competitors in the Relevant Markets and to harm their efforts to compete and innovate. Such companies have long been recognized as cancerous to competition and innovation.

64.     To date, j2 and Catch Curve, either alone or in conjunction with each other, have filed numerous infringement lawsuits against j2's competitors in the Relevant Markets in an extortion scheme to raise competitors' costs or drive them out of the market entirely.

65.     Catch Curve has referred to this scheme to shakedown competitors of j2 as Catch Curve's "AudioFAX Patent Licensing Program" and as Catch Curve's effort to "make innovative technologies available to the public at reasonable terms and conditions." Despite its

claims of innovation, Catch Curve has never conducted any research, invented any products, or provided any services or products in the market. The patents it holds were acquired from another company immediately after it was formed by j2. j2 created Catch Curve to nominally hold title to the AudioFAX Patents and also to charge infringement against companies that compete with j2 in the Relevant Markets. j2 and Catch Curve know that the asserted patents are invalid and do not cover the allegedly infringing activities. Catch Curve extracts costly licenses from companies engaged in competition with j2 in the Relevant Markets, and initiates litigation against companies that do not pay. No lawsuit ever filed by Catch Curve has resulted in a contested judicial finding of infringement by an alleged infringing competitor. Instead, Catch Curve uses the litigation process to extort license fees that cost competitors less than the cost of litigating a case to judgment.

66. IPIG "administers" the j2/Catch Curve licensing scheme. Typically, the patent portfolio administrator identifies potential violators of its clients' patents, establishes a value for them, and handles the collection and administration of licensing fees. For the benefit of j2, Catch Curve and IPIG have utilized the licensing program specifically to raise rivals' costs by threatening and initiating frivolous infringement lawsuits against companies that compete with j2 in the Relevant Product Market.

67. The cost for licenses under the patents by IPIG in its licensing proposals is substantial but never high enough to encourage the targets of the conspiracy to litigate to avoid such cost. The total fees generated from this licensing program enable j2 to lower its costs of participating in the Relevant Markets at the expense of smaller rivals' businesses and while raising their costs to compete with j2.

68. Companies that have refused to pay for licenses, including IGC, have been sued by Catch Curve. Other companies, including significant competitors of j2, have been sued by j2

and/or Catch Curve without having been offered a license. These infringement lawsuits are objectively baseless. j2 and Catch Curve know that the AudioFAX Patents that they seek to monetize and enforce against companies competing with j2 in the Relevant Markets are invalid, unenforceable, and do not cover the services sold by the competitors they have sued. They are predicated on patents that no reasonable litigant would expect to be infringed by companies competing in the Relevant Markets. These patent infringement actions have caused j2's competitors to incur substantial litigation expenses to defend themselves against meritless allegations of infringement. They have forced companies into unnecessary and unwanted licensing arrangements for patents that cannot be construed to cover the activities Catch Curve claims are infringing.

69.     Recently, after a claim construction hearing involving the AudioFAX Patents, the United States District Court for the Central District of California rendered an Opinion, dated May 11, 2007, that found that the claims of the AudioFAX Patents are not infringed by any Internet facsimile service that delivers documents to its customers by any means other than conventional telephone lines. A true copy of the Order is attached hereto as Exhibit 1.

70.     IGC is just one of the latest targets of this patent trolling scheme. j2 and Catch Curve have targeted IGC in an effort to impose costs on IGC that are disproportionately large compared with the total sales of IGC in the Relevant Markets, in an effort to raise IGC's costs to conduct that business and to prevent IGC from expanding its sales and market share in that market.

## MISUSE OF PATENTS IN BAD FAITH INFRINGEMENT LAWSUITS

71.     j2 is the most dominant company in the Relevant Markets. j2, however, has not been content with its dominant market position and has sought ways to use its cash and other liquid assets, which exceed One and Ninety Hundred Million Dollars ($190,000,000.00), to

eliminate its remaining competitors. In order to try to gain complete control of the market, j2 has waged and continues to wage a campaign of acquiring its competitors. If a competitor refuses to be acquired, j2 sues to run that competitor out of business by crushing it with costly patent infringement litigation. j2 has filed multiple lawsuits against its competitors to force them to spend precious time, energy, and money to defend themselves.

72.     The aforesaid lawsuits were and are being brought in bad faith to enforce patents that j2 knows are invalid, not infringed, or unenforceable. In the process of waging these bad faith and anticompetitive lawsuits, j2 also intimidates and harasses the customers of its competitors by threatening to include the customers in the patent lawsuits.

73.     Since 1999, and well prior to the time that Catch Curve acquired the AudioFAX Patents, j2 had stated that the AudioFAX Patents were invalid and inapplicable to the Relevant Markets. Specifically, in the earlier lawsuit charging jFax with infringement of the AudioFAX Patents, j2 asserted that the AudioFAX Patents did not apply to Internet facsimile services. Yet, at present j2 and Catch Curve assert claims for infringement of the AudioFAX Patents against IGC and other entities engaging only in the Relevant Markets by using Internet capabilities. Thus, j2 and Catch Curve have asserted claims of patent infringement that are without merit and brought in bad faith. Litigation asserting the AudioFAX Patents against IGC and others in the Relevant Markets are a sham, being objectively baseless, and are deployed by each of the Defendants wrongfully to eliminate competition.

74.     The claims which AudioFAX, j2, and Catch Curve make under the AudioFAX Patents and the manner in which they construe them are so overbroad, excessive, and unreasonable that they amount to extortion. These claims have been sent by mail and e-mail to scores and possibly hundreds of j2's competitors in violation of the Federal Mail Fraud Statute and the Federal Wire Fraud Statute. Further, the claims they make are calculated to encompass

26

products, services, and technologies that they know are non-infringing, thereby unlawfully seeking to extend the scope of their patents. Catch Curve has used its overly broad construction of these patents and others to mount a litigation assault on companies in the Relevant Markets to restrain competition in the industry.

75.   AudioFAX, Catch Curve, and j2 have mounted a coordinated attack on Internet service providers in the Relevant Markets that compete with j2. They have filed numerous patent infringement actions causing competitors to incur substantial litigation expenses in defending against meritless claims. They have, by extortion, forced other companies into unnecessary and unwanted licensing arrangements for irrelevant patents.

76.   The scheme has worked by offering licenses that were less expensive than the cost to defend the threatened litigation. Indeed, on its website (www.catchcurve.com/about), Catch Curve touts its mission as being "to license its technology without the complications and expense of litigation." Companies that refused to pay, however, were sued in the Northern District of Georgia by Catch Curve's Georgia counsel. Many such suits were then settled for amounts less than the cost of litigation, typically less than $1 million for a lump sum, fully paid-up license. j2 and Catch Curve have employed these anticompetitive suits in furtherance of their scheme to eliminate or lessen competition in the Relevant Markets.

77.   j2 attempted to hide its scheme with and ownership of Catch Curve by making false statements to the public and by failing to report its activities with respect to Catch Curve in its quarterly and annual reports. For example, during a February 6, 2006 conference call with securities analysts, Scott Turicchi, Co-President and Chief Financial Officer of j2, described j2's relationship with Catch Curve as follows:

> STEVE FREITAS (Analyst, Harris Nesbitt Gerard): In some of these suits, it seems like you've come to it jointly with a company called Catch Curve. Can you just describe how those patents are spread among you and that entity?

27

TURICCHI:   Well Catch Curve, we have a small – we have an interest in the Catch Curve entity. They have their own team that goes out and either asserts the patents through litigation or attempts to, you know, generate royalty revenue through settlement. So, we have our set of patents; they have their set of patents. There are instances where we run into each other. There's maybe two or three of the litigations where it's a combination of the patents.

78.   These false and misleading statements were intentionally made to, and did, conceal and cover up j2's real interest in Catch Curve and they therefore constitute additional fraudulent activity in violation of 18 U.S.C. § 1343.

79.   In December 2005, j2 contacted IGC suggesting that j2 was interested in purchasing IGC. After IGC provided confidential information to j2 about its business activities, customers and revenues, j2 made an offer to purchase IGC that was far below the fair value of IGC. After IGC rejected the lowball offer from j2, j2 instructed Catch Curve to sue IGC for patent infringement.

80.   j2 and Catch Curve have demonstrably engaged in a pattern of using unlawful litigation, or the threat thereof, as part of j2's standard negotiations to acquire its competitors and/or to run them out of business.

81.   In addition to the patent infringement litigation against IGC brought in bad faith by Catch Curve, AudioFAX, j2 and Catch Curve have also filed patent infringement lawsuits against industry competitors such as Boston Technology, Inc., Cable & Wireless USA, Inc., Captaris, Inc., Cisco Systems, Inc., Delrina Corporation (subsidiary of Symantec Corporation), Digital Sound Corporation, FaxSav, Inc., Premiere Technologies, Inc. and Premiere Communications, Inc., Sprint Communications Company, Venali, Inc., EasyTel Communications, Protus IP Solutions, Mijanda, Topcall Corporation, GoDaddy.com, Inc., Graphnet, Inc., Fenestrae, Inc., Biscom, Inc., Callware Tech., Inc., Esker S.A. and Esker, Inc., Open Text Corporation, Smith Micro Software, Inc., uReach Technologies, Inc., GFI USA, Inc.,

Callwave and Vera Cruz Marketing Inc. Notably, three of these lawsuits were filed within weeks of EasyTel, Protus, and Mijanda objecting to j2's efforts to register as its trademark the generic term "efax."

82.  Venali has filed an Antitrust Complaint against j2 and some of the other defendants in this action. That Complaint was transformed into a counterclaim against j2 in a suit pending in the United States District Court for the Central District of California, Case No. CV05-04820 DDP. j2's motion to dismiss that counterclaim was DENIED.

83.  GoDaddy filed a multi-count antitrust complaint against j2 and others in the United States District Court in Arizona, Case No. CV06-2474-PHX-NVW.

## Defendants' Racketeering Activity

84.  j2, Catch Curve, Inc., Ressler, McLaughlin, IPIG, Strong, AudioFAX, AudioFAX IP, Bloomfield, Kennedy, Zucker, Turicchi, CRA, Shultz, and FTI, and others unknown, have conducted and are presently conducting an enterprise consisting of an association-in-fact for the purpose of procuring and exploiting patents held by or in the name of AudioFAX, j2, Catch Curve, and others (the *"Trolling Enterprise"*). The continuing unit formed by these parties constitutes a RICO Enterprise within the meaning of 18 U.S.C. § 1961(4), which is engaged in, or the activities of which affect, interstate commerce.

85.  Each of the Defendants is employed by or associated with the Trolling Enterprise, and has managed and conducted the affairs of that Trolling Enterprise, directly or indirectly through a continuing pattern of racketeering activity, and through the repeated and continuous use of the U.S. mail and the interstate use of wires in furtherance of their scheme to fraudulently obtain the issuance of patents and to illegally and wrongfully obtain the payment of money through extortion and the exploitation of patents knowingly obtained through fraud and other inequitable or unlawful conduct. Defendants have utilized the Trolling Enterprise for the

prosecution and enforcement of invalid patents, with the common purpose to fraudulently prosecute the patents in the USPTO and to exploit those patents through extortion, repetitive threats, abusive litigation, harassment of competitors and their competitors' customers, overreaching licensing arrangements, and other strategies, all through a pattern of racketeering activity.

86.    As part of this pattern of racketeering activity, patents being used in the Trolling Enterprise are being divided into multiple sets and then each set of patents is enforced by a different member of the Trolling Enterprise by threats, trade disparagement, baseless litigation, and other forms of intimidation. As described, among the activities of the Trolling Enterprise are the procurement and exploitation of various patents through fraud and other inequitable or unlawful conduct, with the intent and effect of defrauding Internet service providers and competitors of j2, including but not limited to IGC, and seeking to coerce or coercing such persons into paying unconscionable royalty fees to the association-in-fact and its representatives.

87.    The Trolling Enterprise and the Defendants individually have also participated in the scheme to prosecute a continued and unremitting stream of patent applications before the USPTO without full or fair disclosure of all material facts, to use and manipulate USPTO procedures to obtain the issuance of patents in the name of AudioFAX, j2, or Catch Curve, and to exploit those wrongfully obtained patents.

### Pattern of Racketeering Activity

88.    In their associations with and employment by the Trolling Enterprise, each Defendant has managed, conducted and participated in the affairs of that enterprise, directly or indirectly, through a continuing pattern of racketeering activity including the repeated and continuous use of the U.S. mail and the interstate use of wires in furtherance of their scheme to fraudulently obtain the issuance of patents and to illegally and wrongfully obtain the payment of

30

money through the assertion of patents knowingly obtained through fraud and other inequitable or unlawful conduct.

## Use of U.S. Mail and Interstate Wires

89.    Although the following is by no means exhaustive, specific examples of Defendants' acts in the utilization of U.S. mail and interstate wires in support of and furtherance of the extortion scheme and artifice to defraud based upon the fraudulently obtained patents, in furtherance of the Trolling Enterprise, include but are not limited to the following:

      a.    On February 19, 2003, Bloomfield, Kennedy, AudioFAX, Strong, McLaughlin, and CRA used, or caused to be used, the U.S. mail to send a letter from Atlanta, Georgia to IGC in Chicago concerning IGC's alleged infringement of certain of the patents utilized by the Trolling Enterprise.

      b.    On April 23, 2003, Bloomfield, Kennedy, AudioFAX, Strong, McLaughlin, and CRA used, or caused to be used, the U.S. mail to send a letter from Atlanta, Georgia to IGC's attorney in Chicago concerning IGC's alleged infringement of certain of the patents utilized by the Trolling Enterprise.

      c.    On June 16, 2003, Bloomfield, Kennedy, AudioFAX, Strong, McLaughlin, and CRA used, or caused to be used, the U.S. mail to send a letter from Atlanta, Georgia to IGC's attorney in Chicago concerning IGC's alleged infringement of certain of the patents utilized by the Trolling Enterprise.

      d.    On August 15, 2003, Bloomfield, Kennedy, AudioFAX, Strong, McLaughlin, and IPAC used, or caused to be used, the U.S. mail to send a letter from Atlanta, Georgia to IGC's attorney in Chicago concerning IGC's alleged infringement of certain of the patents utilized by the Trolling Enterprise.

e. On November 20, 2003, Bloomfield, Kennedy, AudioFAX, Strong, McLaughlin, and CRA used, or caused to be used, the U.S. mail to send a letter from Atlanta, Georgia to IGC's attorney in Chicago concerning IGC's alleged infringement of certain of the patents utilized by the Trolling Enterprise.

f. On April 27, 2005, j2, Catch Curve, Ressler, IPAC, Zucker, Turrichi, Bloomfield, Kennedy, AudioFAX, Strong, McLaughlin, and CRA used, or caused to be used, the interstate wires to make a telephone call from Atlanta, Georgia to IGC's attorney in Chicago concerning IGC's alleged infringement of certain of the patents utilized by the Trolling Enterprise.

g. On June 16, 2005, j2, Catch Curve, Ressler, IPAC, Zucker, Turicchi, Bloomfield, Kennedy, AudioFAX, Strong, McLaughlin, and CRA used, or caused to be used, the U.S. mail to send a letter from Atlanta, Georgia to IGC's attorney in Chicago concerning IGC's alleged infringement of certain of the patents utilized by the Trolling Enterprise.

h. On June 16, 2005, j2, Catch Curve, Ressler, McLaughlin, Strong, IPAC, Zucker, and Turicchi used, or caused to be used, the U.S. Mail to send a letter from Atlanta, Georgia to IGC's attorney in Chicago concerning IGC's alleged infringement of the patents utilized by the Trolling Enterprise.

i. On October 3, 2005, j2, Catch Curve, Ressler, McLaughlin, Strong, IPAC, Zucker, and Turicchi used, or caused to be used, the interstate wires to effectuate the transmission of an e-mail to IGC's attorney in Chicago concerning IGC's alleged infringement of the patents utilized by the Trolling Enterprise.

j. On November 1, 2005, j2, Catch Curve, Ressler, McLaughlin, Strong, IPAC, Zucker, and Turicchi used, or caused to be used, the interstate wires to effectuate

32

the transmission of an e-mail to IGC's attorney in Chicago concerning IGC's alleged infringement of the patents utilized by the Trolling Enterprise.

        k.      On January 26, 2006, j2, Catch Curve, Ressler, McLaughlin, Strong, IPAC, Zucker, and Turicchi used, or caused to be used, the interstate wires to effectuate the transmission of an e-mail to IGC's attorney in Chicago concerning IGC's alleged infringement of the patents utilized by the Trolling Enterprise.

        l.      On July 27, 2006, j2, Catch Curve, Ressler, McLaughlin, Strong, IPAC, Zucker, Turicchi, Schultz, and FTI used, or caused to be used, interstate wires to effectuate the transmission of e-mail to finalize j2's purchase of Send2Fax LLC.

        m.      On August 1, 2006, j2, Catch Curve, Ressler, McLaughlin, Strong, IPAC, Zucker, Turicchi, Schultz and FTI used, or caused to be used, interstate wires to announce the acquisition of Send2Fax LLC by j2.

        90.      Each of the Defendants named herein has engaged in the commission of two or more of the above-described acts within the four years prior to filing this Complaint.

        91.      All of the Defendants participated in the violation of 18 U.S.C. § 1962(c) in one or more capacities as primary actors and/or agents and representatives of one another and/or aiders and abettors of one another.

**Continuity and Relatedness of Pattern of Racketeering**

        92.      Each of the foregoing acts of racketeering by the Defendants is related, continuous, and part of a pattern of conduct pertaining to multiple patents, directed toward multiple victims including but not limited to IGC, commencing in and continuing over the past four years. Plaintiff is informed and believes that in addition to targeting IGC, Defendants operated the Trolling Enterprise through extortion, mail fraud, and wire fraud, directing similar

33

claims of infringement, and similar threats of litigation, to, among others, Boston Technology, Inc., Cable & Wireless USA, Inc., Captaris, Inc., Cisco Systems, Inc., Delrina Corporation (subsidiary of Symantec Corporation), Digital Sound Corporation, FaxSav, Inc., Premiere Technologies, Inc. and Premiere Communications, Inc., Sprint Communications Company, Venali, Inc., EasyTel Communications, Protus IP Solutions, Mijanda, Topcall Corporation, GoDaddy.com, Inc., Graphnet, Inc., Fenestrae, Inc., Biscom, Inc., Callware Tech., Inc., Esker S.A. and Esker, Inc., Open Text Corporation, Smith Micro Software, Inc., uReach Technologies, Inc., GFI USA, Inc., register.com, and Outblaze Limited and used the U.S. mail and wires to send letters to them substantially similar to those sent to Plaintiff.

93.    The fraudulent scheme furthered by these acts of racketeering is ongoing and continuous as Defendants have informed Plaintiff that Catch Curve has patent applications currently pending before the PTO which it asserts are entitled to priority based upon prior patent applications claiming priority dates dating back to 1988. Accordingly, Defendants have, and are, engaged in a continuing and related pattern of racketeering activity within the meaning of 18 U.S.C. § 1961(5), which poses a threat of continued criminal activity.

### The Relevant Markets

94.    Defendants' anticompetitive conduct described above has had, and will continue to have, an adverse effect on the Relevant Markets, including but not limited to j2's artificially inflated pricing.

95.    There are substantial barriers to entry into the Relevant Markets including, without limitation, patents owned by AudioFAX, j2, and Catch Curve. Further, there are no adequate alternative products or services for the end users in the Relevant Markets.

34

96.    In addition to the anticompetitive effects on the Relevant Markets, the Defendants' anticompetitive conduct has had and is likely to continue to have restraining effects on the market for innovation in the technologies for Relevant Markets.

### Interstate Commerce

97.    The conduct described above affects and restrains substantial amounts of interstate and foreign commerce.

### COUNT I

### Violation of Section 7 of the Clayton Act
### Monopolization
### (j2)

98.    IGC repeats and realleges each of the allegations contained in Paragraphs 1 through 97 above as Paragraph 98 of this Count I.

99.    By means of the anticompetitive conduct alleged herein directed at competitors of j2, including but not limited to IGC, j2 has achieved for itself a virtual monopoly in the Relevant Markets.

100.   j2 has violated 15 United States Code §§ 12, 13, 14-19, 20, 21, 22-27 by destroying competition in the Relevant Markets through the purchase of the patents, stock, and assets of at least the following corporations:

    a.    Hamilton Communication;
    b.    Total Telecom;
    c.    M4 Internet;
    d.    eFax;
    e.    Electric Mail;
    f.    Onebox;
    g.    Call Sciences, Ltd.;
    h.    Data On Call; and
    i.    Puma Unified Communications, Ltd.

35

101. By reason of the foregoing violations, IGC has been damaged in its business and property.

**COUNT II**

**Violations of RICO**
**(18 U.S.C. § 1962(c) & (d))**
**(Against All Defendants)**

102. IGC repeats and realleges each of the allegations contained in Paragraphs 1 through 101 above as Paragraph 102 of Count II.

103. Each Defendant is an entity capable of holding a legal or beneficial interest in property and, as such, constitutes a "person" within the meaning of 18 U.S.C. § 1961(3).

104. Each of the Defendants has aided and abetted and engaged in two or more violations of the Federal Mail Fraud Statute, 18 U.S.C. § 1341, and/or the Federal Wire Fraud Statute, 18 U.S.C. § 1343, and have thereby engaged in predicate acts of racketeering within the meaning of 18 U.S.C. § 1961(1)(B), within the past four years, in the United States.

105. As a direct and proximate result of the Defendants' participating directly in and conducting the affairs of the Trolling Enterprises through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(c) and conspiracy to violate 18 U.S.C. § 1962(c), Plaintiff has been injured in its business and property and, pursuant to the civil remedy provisions of 18 U.S.C. § 1964(c), is thereby entitled to recover threefold the damages it has suffered, together with its costs of suit and reasonable attorneys' fees and expenses thereon, from Defendants, and a declaration that any and all patents and pending patent claims asserted by Defendants against Plaintiff are invalid and/or unenforceable.

106. j2, Catch Curve, Ressler, McLaughlin, Strong, AudioFAX, AudioFAX IP, Bloomfield, Kennedy, Zucker, Turicchi, Hamerslag, CRA, Schultz, and FTI have utilized the mail, wire, and e-mail in making fraudulent statements to third parties and to the USPTO.

107.    By reason of the foregoing violations, IGC has been damaged in its business and property.

## Count III

### Violation of Sherman Act §§ 1 and 3
### (Restraint of Trade by j2)

108.    IGC repeats and realleges each of the allegations contained in Paragraphs 1 through 107 above as Paragraph 108 of this Count III.

109.    Prior to the time that Catch Curve commenced its infringement action against IGC, Catch Curve and j2 knew that the AudioFAX Patents were procured by fraud on the USPTO. j2 also knew that the claims made by AudioFAX and Catch Curve that j2 competitors, including IGC, infringed the AudioFAX Patents were objectively baseless in that no reasonable litigant could realistically expect success on the merits.    Nonetheless, with the intent of restraining trade and forcing j2 competitors, including IGC, into a licensing arrangement that would make them less threatening competitors, and in bad faith, j2 and Catch Curve commenced infringement actions against j2's competitors, including IGC.

110.    Said litigation has been brought in furtherance of a violation of the antitrust laws that is already being perpetuated by j2 in the Relevant Markets.

111.    j2's actions have restrained trade in the Relevant Markets.

112.    By reason of the foregoing violations of the antitrust laws, IGC has been damaged in its business or property.

## Count IV

### Sherman Act § 1
### Contract or Conspiracy to Restrain Trade
### (All Defendants)

113. IGC incorporates the allegations contained in Paragraphs 1-112 above as Paragraph 113 of Count IV.

114. Defendants have agreed and conspired among themselves to restrain trade in the Relevant Markets.

115. Defendants have acted overtly to further their conspiracy by, among other things:

- Perpetrating fraud on the USPTO in order to obtain the AudioFAX Patents;

- Threatening and instituting objectively baseless infringement actions against IGC and other competitors of j2 in the Relevant Markets, with full knowledge that the patents-in-suit were invalid, unenforceable, obtained by fraud, and not infringed by IGC's or other competitors' services, for the purpose of and thereby subjecting the targets of this conspiracy to foreclosure from the Relevant Markets and to unnecessary license fees and litigation expenses, and raising their costs while lowering j2's costs; and

- Acting to interfere with IGC's and other j2's competitors' business expectancies.

116. Defendants' agreement and conspiracy to restrain trade have taken place and impacted and/or affected interstate commerce and the Relevant Markets.

117. Defendants' agreement and their conspiracy to restrain trade, in causing harm to competition and consumers, have caused a loss of revenue by Plaintiff.

## Count V

### Sherman Act § 2
### (Monopolization by j2)

118. IGC incorporates the allegations contained in Paragraphs 1-117 above as Paragraph 118 of Count V.

119. j2 has acted overtly to create its monopoly in the Relevant Markets by, among other things:

- Perpetrating fraud on the USPTO in order to obtain the j2 and AudioFAX Patents;

- Threatening and instituting objectively baseless infringement actions against IGC and other competitors of j2 in the Relevant Markets, with full knowledge that the patents-in-suit were invalid, unenforceable obtained by fraud and not infringed by IGC's or other competitors' products and services, for the purpose of and thereby subjecting the targets of this monopolization to foreclosure from the Relevant Markets and to unnecessary license fees and litigation expenses, and raising their costs while lowering j2's costs; and

- Acting to interfere with IGC's and other j2 competitors' business expectancies.

120. j2's monopoly has been achieved and has impacted interstate commerce and the Relevant Markets.

## Count VI

### Sherman Act § 2
### (Attempt to Monopolize by All Defendants)

121. IGC incorporates the allegations contained in Paragraphs 1-120 above as Paragraph 121 of Count VI.

122. Defendants have agreed among themselves to attempt to create a monopoly in j2 in the Relevant Markets.

123. Defendants have acted overtly by, among other things:

- Perpetrating fraud on the USPTO in order to obtain the AudioFAX Patents;

- Threatening and instituting objectively baseless infringement actions against IGC and other competitors of j2 in the Relevant Markets, with full knowledge that the patents-in-suit were invalid, unenforceable, obtained by fraud, and not infringed by IGC's or other competitors' services, for the purpose of and thereby subjecting the targets of this conspiracy to foreclosure from the Relevant Markets and to unnecessary license fees and litigation expenses, and raising their costs while lowering j2's costs; and

- Acting to interfere with IGC's and other j2's competitors' business expectancies.

124. There is a dangerous probability that j2 will obtain monopoly power in the Relevant Markets.

125. Defendants' agreement and conspiracy has taken place and has impacted and/or affected interstate commerce within the past four years.

126. Defendants' agreement and conspiracy, in causing harm to competition and consumers, has caused a loss of revenue by Plaintiff.

## Count VII

### Sherman Act § 2
### (Conspiracy to Monopolize by All Defendants)

127. IGC incorporates the allegations contained in Paragraphs 1-126 above as Paragraph 127 of Count VII.

128. Defendants have conspired to create a monopoly in the Relevant Markets.

129. Defendants have acted overtly to further their conspiracy by, among other things:

- Perpetrating fraud on the USPTO in order to obtain the AudioFAX Patents;

- Threatening and instituting objectively baseless infringement actions against IGC and other competitors of j2 in the Relevant Markets, with full knowledge that the patents-in-suit were invalid, unenforceable, obtained by fraud and not infringed by IGC's or other competitors' services, for the purpose of and thereby subjecting the targets of this conspiracy to foreclosure from the Relevant Markets and/or to unnecessary license fees and litigation expenses, and raising their costs while lowering j2's costs; and

- Acting to interfere with IGC's and other j2's competitors' business expectancies.

130. There is a dangerous probability that j2 will obtain monopoly power in the Relevant Markets as a result of this conspiracy.

131.  Defendants' agreement and conspiracy has taken place and has impacted and/or affected interstate commerce.

132.  Defendants' agreement and conspiracy, in causing harm to competition and consumers, has caused a loss of revenue by Plaintiff.

## Count VIII

### Illinois Antitrust Act
### (740 ILCS 10 *et seq.*)
### Restraint of Trade by j2

133.  IGC repeats and realleges each of the allegations contained in Paragraphs 1 through 132 above as Paragraph 133 of this Count VIII.

134.  Prior to the time that Catch Curve commenced its infringement action against IGC, Catch Curve and j2 knew that the AudioFAX Patents were procured by fraud on the USPTO. j2 also knew that the claims made by AudioFAX and Catch Curve that j2's competitors, including IGC, infringed the AudioFAX Patents were objectively baseless in that no reasonable litigant could realistically expect success on the merits. Nonetheless, with the intent of restraining trade and forcing j2's competitors, including IGC, into a licensing arrangement that would make them less threatening competitors, and in bad faith, j2 and Catch Curve commenced infringement actions against j2's competitors, including IGC.

135.  Said litigation has been brought in furtherance of a violation of the antitrust laws that is already being perpetuated by j2 in the Relevant Markets.

136.  j2's actions have restrained trade in the Relevant Markets.

137.  By reason of the foregoing violations of the antitrust laws, IGC has been damaged in its business or property.

42

## Count IX

### Illinois Antitrust Act
### (740 ILCS 10 *et seq.*)
### Conspiracy to Restrain Trade
### (All Defendants)

138. IGC incorporates the allegations contained in Paragraphs 1-137 above as Paragraph 138 of Count IX.

139. Defendants have agreed and conspired to restrain trade in the Relevant Markets.

140. Defendants have acted overtly to further their conspiracy by, among other things:

- Perpetrating fraud on the USPTO in order to obtain the AudioFAX Patents;

- Threatening and instituting objectively baseless infringement actions against IGC and other competitors of j2 in the Relevant Markets, with full knowledge that the patents-in-suit were invalid, unenforceable, obtained by fraud, and not infringed by IGC's or other competitors' services, for the purpose of and thereby subjecting the targets of this conspiracy to foreclosure from the Relevant Markets and to unnecessary license fees and litigation expenses, and raising their costs while lowering j2's costs; and

- Acting to interfere with IGC's and other competitors' business expectancies.

141. Defendants' agreement and conspiracy to restrain trade has taken place and has impacted and/or affected interstate commerce and the Relevant Markets.

142. Defendants' agreement and conspiracy to restrain trade, in causing harm to competition and consumers, has caused a loss of revenue by IGC.

## Count X

### Illinois Antitrust Act
### (740 ILCS 10 *et seq.*)
### Monopolization by j2

143.  IGC incorporates the allegations contained in Paragraphs 1-142 above as Paragraph 143 of Count X.

144.  j2 has acted overtly to create its monopoly in the Relevant Markets by, among other things:

- Perpetrating fraud on the USPTO in order to obtain the j2 and AudioFAX Patents;

- Threatening and instituting objectively baseless infringement actions against IGC and other competitors of j2 in the Relevant Markets, with full knowledge that the patents-in-suit were invalid, unenforceable, obtained by fraud, and not infringed by IGC's or other competitors' products and services, for the purpose of and thereby subjecting the targets of this monopolization to foreclosure from the Relevant Markets and to unnecessary license fees and litigation expenses, and raising their costs while lowering j2's costs; and

- Acting to interfere with IGC's and other competitors' business expectancies.

145.  j2's monopoly has been achieved and has impacted interstate commerce and the Relevant Markets.

## Count XI

### Illinois Antitrust Act
### (740 ILCS 10 *et seq.*)
### Attempt to Monopolize
### (All Defendants)

146. IGC incorporates the allegations contained in Paragraphs 1-145 above as Paragraph 146 of Count XI.

147. Defendants have agreed to attempt to create a monopoly in j2 in the Relevant Markets.

148. Defendants have acted overtly by, among other things:

- Perpetrating fraud on the USPTO in order to obtain the AudioFAX Patents;

- Threatening and instituting objectively baseless infringement actions against IGC and other competitors of j2 in the Relevant Markets, with full knowledge that the patents-in-suit were invalid, unenforceable, obtained by fraud, and not infringed by IGC's or other competitors' services, for the purpose of and thereby subjecting the targets of this conspiracy to foreclosure from the Relevant Markets and to unnecessary license fees and litigation expenses, and raising their costs while lowering j2's costs; and

- Acting to interfere with IGC's and other competitors' business expectancies.

149. There is a dangerous probability that j2 will obtain monopoly power in the Relevant Markets.

150. Defendants' agreement and conspiracy has taken place and has impacted and/or affected interstate commerce.

151. Defendants' agreement and conspiracy, in causing harm to competition and consumers, has caused a loss of revenue by Plaintiff.

## Count XII

### Illinois Antitrust Act
### (740 ILCS 10 *et seq*.)
### Conspiracy to Monopolize
### (All Defendants)

152. IGC incorporates the allegations contained in Paragraphs 1-151 above as Paragraph 152 of Count XII.

153. Defendants have conspired to create a monopoly in the Relevant Markets.

154. Defendants have acted overtly to further their conspiracy by, among other things:

- Perpetrating fraud on the USPTO in order to obtain the AudioFAX Patents;

- Threatening and instituting objectively baseless infringement actions against IGC and other competitors of j2 in the Relevant Markets, with full knowledge that the patents-in-suit were invalid, unenforceable, obtained by fraud, and not infringed by IGC's or other competitors' services, for the purpose of and thereby subjecting the targets of this conspiracy to foreclosure from the Relevant Markets and to unnecessary license fees and litigation expenses, and raising their costs while lowering j2's costs; and

- Acting to interfere with IGC's and other competitors' business expectancies.

155. There is a dangerous probability that j2 will obtain monopoly power in the Relevant Markets.

156. Defendants' agreement and conspiracy has taken place and has impacted and/or affected interstate commerce.

157. Defendants' agreement and conspiracy, in causing harm to competition and consumers, has caused a loss of revenue by Plaintiff.

## Count XIII

### Violation of the Illinois Deceptive Trade Practices Act
### (815 ILCS 510 *et seq.*)
### (All Defendants)

158. Plaintiffs repeat and reallege and incorporate by this reference Paragraphs 1 through 157 above as Paragraph 158 of Count XIII.

159. The above described acts and practices of Defendants constitute deceptive trade practices and unfair competition in violation of the Illinois Deceptive Trade Practices Act.

160. Plaintiffs as well as consumers, *i.e.*, the entire public, will continue to sustain injury and damages from this unfair competition unless Defendants are enjoined from continuing their unlawful conduct and seeking to exact a tax on the public in the form of an unlawful "license fee."

161. As a direct and proximate result of Defendants' violations of the Illinois Deceptive Trade Practices Act, Plaintiffs are entitled to recover reasonable attorneys' fees and costs in connection with this claim, appropriate restitution from Defendants of all monies received by reason of their unlawful and deceptive and unfair business practices, an injunction barring Defendants from their wrongful assertions of patent infringement against Plaintiffs, and such other equitable relief as may be just and appropriate.

47

## Count XIV

### Breach of Contract

162. Plaintiffs repeat and reallege and incorporate by this reference Paragraphs 1 through 161 above as Paragraph 162 of Count XIV.

163. IGC and j2 entered into a Software License Agreement on June 30, 2000 whereby j2 warranted that IGC's Internet facsimile service did not infringe any patents of which j2 was aware.

164. At the time j2 executed the Software License, it was aware of the AudioFAX Patents and knew that AudioFAX and Catch Curve planned to charge IGC with their infringement.

165. j2 has breached its Software License warranty.

166. By reason of the foregoing breach of warranty, IGC has been damaged in its business and property.

**WHEREFORE**, Plaintiff IGC respectfully requests that:

A.    This Court enjoin j2's current antitrust activities;

B.    This Court break up j2's monopoly and require the divestiture of the companies and assets acquired during the creation of its monopoly;

C.    This Court order j2 to pay IGC $5 million for its breach of contract;

D.    This Court order Catch Curve to dismiss its current lawsuit in Georgia against IGC;

E.    IGC be awarded treble damages in an amount to be determined at trial;

F.    IGC be awarded punitive damages in an amount to be determined at trial;

G.    IGC be awarded its reasonable attorneys' fees and costs pursuant to all available federal and state statutes or rules, including but not limited to the Sherman Act; and

H.    The Court grant such other relief as it deems just and proper, pursuant to, among other things, 28 U.S.C. § 2202.

## JURY TRIAL

Plaintiff demands a trial by jury on all counts of the Complaint and on all issues so triable.

Dated:  June 21, 2007

INTEGRATED GLOBAL CONCEPTS, INC.

By: _____
One of Its Attorneys

Robert J. Schneider
John R. Crossan
James P. Sullivan
CHAPMAN AND CUTLER LLP
111 W. Monroe St., #1700
Chicago, IL  60603
312-845-3919

# EXHIBIT 1

1

2     FILED
      CLERK, U.S. DISTRICT COURT

3        MAY 1 1 2007

4     CENTRAL DISTRICT OF CALIFORNIA
      BY _____ DEPUTY

                                          ✓  **Priority**
                                          ✓  **Send**
                                             **Clsd**
                                          ✓  **Enter**
                                         N✓  JS-5/JS-6
                                             JS-2/JS-3
                                          ── **Scan Only**

5

6                                    ENTERED
                                   CLERK, U.S. DISTRICT COURT

7                                      MAY 1 1 2007

8         UNITED STATES DISTRICT COURT
                                   CENTRAL DISTRICT OF CALIFORNIA
9         CENTRAL DISTRICT OF CALIFORNIA   BY _____ DEPUTY

10

11  CATCH CURVE, INC.,            )   Case No. CV 05-04820 DDP (AJWx)
                                   )
12                 Plaintiff,      )   **CLAIM CONSTRUCTION ORDER**
                                   )
13       v.                        )   [Plaintiff's Opening Claim
                                   )   Construction Brief filed on
14  VENALI, INC.,                  )   October 13, 2006; Defendant's
                                   )   Opening Claim Construction Brief
15                 Defendants.     )   filed on October 16, 2006]
                                   )
16  ─────────────────────────────

17       This matter is before the Court for claim construction.  Catch

18  Curve, Inc., Venali, Inc.,[1] and Protus IP Solutions, Inc.

19  ("Protus"), have submitted briefs[2] regarding construction of patent

20

21

22  ──────────────────

23       [1] When Venali originally filed its opening claim construction
    brief and reply brief with this Court, it joined in the arguments
24  of CallWave, a defendant in a then-pending infringement action
    bought by Catch Curve.  Catch Curve, Inc. v. CallWave, Inc., CV 05-
25  04819 DDP (AJWx) (C.D. Cal.).  Since that time, the CallWave action
    has been dismissed by stipulation of the parties.  (See March 23,
26  2007, Stip. & Order.)  Because Venali and Protus has both relied on
    CallWave's briefs, however, the Court has reviewed them.

27       [2] At the hearing on this matter, Protus indicated that it had
    filed a motion for leave to file a surreply in this matter.  As
28  neither Catch Curve nor the Court had the opportunity to review or
    respond to the surreply before the hearing, the Court hereby denies
    Protus' motion.

81

1 claims.[3] The goal of this order is to construe the patents and
2 determine the appropriate definitions for the disputed terms.

3

4 **I.    LITIGATION BACKGROUND**

5     A.    Catch Curve's Infringement Suit Against Venali

6     On July 1, 2005, Plaintiff Catch Curve brought this suit
7 against Defendant Venali, alleging patent infringement. Catch
8 Curve is the owner by assignment of the following patents: U.S.
9 Patent No. 4,994,926 (the "'926 Patent"), U.S. Patent No. 5,291,302
10 (the "'302 Patent"), U.S. Patent No. 5,459,584 (the "'584
11 Patent"), U.S. Patent No. 6,643,034 (the "'034 Patent"), and U.S.
12 Patent No. 6,785,021 (the "'021 Patent"). These patents are all
13 entitled "Facsimile Telecommunications System and Method." Venali
14 provides a fax-to-email service that Catch Curve argues infringes
15 these patents under 35 U.S.C. § 271.

16     On December 5, 2005, Venali filed an answer to the complaint
17 and a counterclaim against Catch Curve. On December 27, 2006,
18 Venali filed an answer, amended counterclaim, and third-party
19 complaint against j2 (Catch Curve's parent company). On January 8,
20 2007, Venali filed a corrected answer to the complaint, amended
21 counterclaim and third party complaint.

22     In its answer, Venali contends that it is not infringing, and
23 will not infringe, directly or indirectly, any claim of the
24 patents-in-suit. Venali also asserts a number of affirmative

25

26     [3] Venali and Protus ("Defendants") have agreed that their
Markman hearings should be heard at the same time because they
27 pertain to construction of identical claims and nearly identical
terms. Thus, the Court has addressed their claim construction
28 arguments together in ruling. The same order has been issued in
both cases.

1 defenses: (1) the patents-in-suit are invalid for failure to comply

2 with the requirements of 35 U.S.C. § 101, et seq.; (2) claims under

3 the patents-in-suit are barred, in whole or in part, by the

4 doctrines of laches, waiver and estoppel; (3) Catch Curve has

5 failed to state a claim upon which relief can be granted pursuant

6 to Fed. R. Civ. P. 12(b)(6); (4) Catch Curve's claims for

7 injunctive relief are barred by the existence of an adequate remedy

8 at law; (5) Catch Curve is precluded by the doctrine of prosecution

9 history estoppel and/or prior art from asserting any construction

10 of the claims in the patents-in-suit that would cover Venali's

11 accused products and/or services; (6) Catch Curve is precluded from

12 enforcing the patents-in-suit due to patent misuse; and (7) Catch

13 Curve's conduct related to the patents-in-suit constitutes unclean

14 hands and renders the patents unenforceable.

15

16     B.   Venali's Counterclaim Against Catch Curve and Third Party

17          Complaint Against j2

18     In its amended counterclaim and third party complaint, Venali

19 alleges that j2 and Catch Curve have engaged in an illegal scheme

20 to unfairly compete with Venali and other competitors in the

21 consumer/small office/home office ("SOHO") Internet facsimile

22 services industry in violation of the Sherman and Clayton Acts, the

23 Lanham Act and California Unfair Competition Law.  Venali alleges

24 that the following conduct by Catch Curve and j2 supports its

25 claims: (1) harassment of competitors generally, and Venali in

26 particular, by bringing baseless patent infringement suits; (2)

27 tortious interference with Venali's business relations based on a

28 campaign of threats of patent infringement lawsuits targeting

3

1 Venali's customers; (3) willful infringement of competitors'

2 trademarks; (4) dissemination of false information about the

3 validity and applicability of the Audio Fax patent portfolio; and

4 (5) other unfair, anti-competitive, and illegal actions.

5      Venali also alleges that j2 was instrumental in the creation

6 of Catch Curve, that Catch Curve is a wholly owned subsidiary of j2

7 and at all relevant times has been the alter ego of j2.  Venali

8 asserts that in furtherance of its anti-competitive scheme j2 has

9 sought to conceal its relationship with Catch Curve.   On April 30,

10 2007, this Court issued an Order Granting in Part and Denying in

11 Part Catch Curve's Motion to Dismiss Counts Two through Six and

12 Eight of Venali's counterclaim and third party complaint.  In its

13 Order, the Court determined that Venali's Sherman Act and sham

14 litigation claims should stand pending this claim construction

15 hearing.  The Court dismissed Venali's tying and § 17200

16 counterclaims with leave to amend.

17

18      C.   Catch Curve's Infringement Suit Against Protus

19      Catch Curve has also brought a similar suit against Protus,

20 alleging infringement of the same five patents.  Like Venali,

21 Protus also operates an online fax to e-mail service.  Protus has

22 also filed various counterclaims against Catch Curve.

23

24 II.  THE CLAIM CONSTRUCTION PROCESS

25      An infringement analysis involves a two-step inquiry: (1)

26 determining the meaning and scope of the patent claims asserted to

27 be infringed; and (2) comparing the properly construed claims to

28 the accused device.  Markman v. Westview Instruments, Inc., 52 F.3d

1 967, 976 (Fed. Cir. 1995), aff'd, 517 U.S. 370 (1996).  The current

2 hearing seeks only to complete the first step of this inquiry.

3      The Supreme Court has held that claim construction is a

4 question of law for courts, not juries.  Markman v. Westview

5 Instruments, Inc., 517 U.S. 370 (1996).  Claim construction is

6 conceptually distinct from discovery of which products or processes

7 might be infringing.  The fundamental underlying question is the

8 meaning of the patent claims to a person having ordinary skill in

9 the art at the effective filing date of the patents.

10      The first step is to look at to the words of the claims

11 themselves, to define the scope of the patented invention.  K-2

12 Corp. v. Salomon S.A., 191 F.3d 1356, 1364 (1999).  The courts have

13 frequently stated the words of a claim are generally given their

14 ordinary and customary meaning.  Vitrionics Corp. v. Conceptronic,

15 Inc., 90 F.3d 1576, 1582 (Fed. Cir. 1996).  The ordinary and

16 customary meaning of a claim term is the meaning that the term

17 would have to the person of ordinary skill in the art in question

18 at the time of the invention, i.e., as of the effective filing date

19 of the patent application.  Phillips v. AWH Corp., 415 F.3d 1303,

20 1313 (Fed. Cir. 2005) (en banc).  The inquiry into how a person of

21 ordinary skill in the art understands a claim term provides an

22 objective baseline from which to begin claim interpretation.  Id.

23 That starting point is based on the well-settled understanding that

24 inventors are typically persons skilled in the field of the

25 invention and that patents are addressed to and intended to be read

26 by others of skill in the pertinent art.  Id.

27      Other claims of the patents in question, both asserted and

28 unasserted, can also be valuable sources of enlightenment as to the

1 meaning of a claim term. _Id._ at 1314. Because claim terms are

2 normally used consistently throughout the patent, the usage of a

3 term in one claim can often illuminate the meaning of the same term

4 in other claims. _Id._ Differences among claims can also be a

5 useful guide in understanding the meaning of particular claim

6 terms. _Id._

7      The claims, of course, do not stand alone; the person of

8 ordinary skill in the art is deemed to read the claim term not only

9 in the context of the particular claim in which the disputed term

10 appears, but in the context of the entire patent, including the

11 specification. _Id._ at 1313, 1314 (emphasis added). This is true

12 because although the claims themselves may provide guidance as to

13 the meaning of a particular term, those terms are part of an

14 "integrated written instrument . . . consisting principally of a

15 specification that concludes with the claims." _Id._ at 1315

16 (quotations omitted). Thus, the specification is "the primary

17 basis for construing the claims" in light of the "statutory

18 requirement that the specification describe the claimed invention

19 in full, clear, and exact terms." _Id._ (internal quotations

20 omitted) (emphasis added).

21      In other words, "the best source for understanding a technical

22 term is the specification from which it arose, informed as needed,

23 by the prosecution history." _Id._ (citations and quotations

24 omitted). Consistent with this principle, the courts have

25 recognized that the specification may reveal a special definition

26 given to a claim term by the patentee that differs from the meaning

27 it would otherwise possess. _Id._ at 1316. In such cases, the

28 inventor's lexicography governs. _Id._ In other cases, the

1 specification may reveal an intentional disclaimer, or disavowal,

2 of claim scope by the inventor. _Id._ In that instance as well, the

3 inventor has dictated the correct claim scope, and the inventor's

4 invention, as expressed in the specification, is regarded as

5 dispositive. _Id._

6     The prosecution history also plays an important role in claim

7 interpretation "by demonstrating how the inventor understood the

8 invention and whether the inventor limited the invention in the

9 course of prosecution, making the claim scope narrower than it

10 would otherwise be." _Id._ at 1317. The prosecution history

11 consists of "the complete record of the proceedings before the

12 Patent Trademark Office [("PTO")] and includes the prior art cited

13 during the examination of the patent." _Id._ Like the

14 specification, the prosecution history provides evidence of how the

15 PTO and the inventor understood the patent. _Id._ Although the

16 prosecution history is generally less useful than the specification

17 for claim construction purposes, it can still can inform the

18 meaning of the claim language by demonstrating how the inventor

19 understood the invention and whether the inventor limited the

20 invention in the course of prosecution, making the claim scope

21 narrower than it would otherwise be. _Id._

22     Consideration of the claim language, the specification, and

23 the prosecution history - collectively referred to as the

24 "intrinsic evidence" - should resolve any ambiguity in claim terms

25 in most situations. _See id._ at 1313-14 (citation omitted). Only

26 in instances where the meaning of the claim term remains ambiguous

27 in light of the intrinsic evidence may the Court consider certain

28 "extrinsic evidence" in construing the claims. However, expert

7

1 testimony may be helpful for a variety of purposes, such as to
2 provide background on the technology at issue, to explain how an
3 invention works, to ensure that the court's understanding of the
4 technical aspects of the patent is consistent with that of a person
5 of skill in the art, or to establish that a particular term in the
6 patent or the prior art has a particular meaning in the pertinent
7 field. See id. at 1319 (citation omitted).

8     Dictionaries and treatises can also be useful extrinsic
9 evidence. Id. at 1318. However, precedent counsels against
10 reliance on dictionary definitions at the expense of the
11 specification, because such reliance "focuses the inquiry on the
12 abstract meaning of words rather than on the meaning of claim terms
13 within the context of the patent." Id. at 1321; see also Nystrom
14 v. Trex Co., 424 F.3d 1136, 1145 (Fed. Cir. 2005).

15

16 **III. PATENTS-IN-SUIT**

17     The technology at issue is a fax communications system which
18 was designed to improve security and save redial efforts by
19 transmitting facsimile machines when the intended destination fax
20 machine is busy or otherwise unavailable. The technology
21 accomplishes this by providing a "store and forward facility"
22 ("SAFF") which receives faxes transmitted by an originating fax
23 machine, stores them, and forwards (or retransmits) these messages
24 to their intended destinations at a time when the receiving machine
25 is available.

26     Thus, a SAFF essentially acts as a proxy for a transmitting
27 fax machine. When the receiving fax machine is available, the fax
28 message and the call status information are delivered by the SAFF

8

1 to the receiving machine on behalf of the transmitting machine. If
2 the receiving fax machine is not available, (e.g., if the receiving
3 fax machine is busy), a SAFF stores the fax message and call status
4 information and attempts retransmission a number of times. By
5 doing so, the system eliminates "trial and error" delivery attempts
6 by the originating machine.

7     At the claim construction hearing, the parties confirmed that
8 the effective filing date of the '926 patent is September 1988.
9 They also confirmed that the effective filing date for certain
10 parts of the remaining patents-in-suit is February 12, 1991.

11

12 **IV.  CONSTRUCTION OF THE CLAIM TERMS**

13     This dispute turns on whether the term "fax/facsimile" in the
14 patents-in-suit requires transmissions using facsimile protocol and
15 machines that can direct and interpret it.  Fax technology requires
16 the completion of a plurality of "handshaking functions" between
17 communication transceivers prior to transmission to ensure that
18 appropriate phasing and transmitter-receiver relationships are
19 established.  This handshaking function, or "digital dialogue," is
20 the "protocol" by which receiving fax machines are able to decipher
21 and process the information sent by the originating fax
22 machine.

23     Catch Curve's position is that the use of the word "fax" in
24 the patents-in-suit does not require the use of any particular
25 protocol for fax transmissions or fax machines.  Venali and Protus
26 contend that the claims asserted in the patents-in-suit require the
27 use of fax protocol.
28 ///

A.  Facsimile/Facsimile Protocol

Catch Curve argues that "facsimile protocol" should be construed as a "format and procedure that governs the transmission of facsimile messages from an originating facsimile machine to a call handling facility."  Catch Curve contends that because the term "facsimile protocol" is recited only in one claim, it should not be imported as a limitation on all use of the word "facsimile."

Defendants argue that although the term "facsimile protocol" only appears explicitly in claim 69 of the '021 patent, the concept of "facsimile protocol" is necessarily present in all of the claim limitations that discuss fax machines or fax messages.  To hold otherwise, Defendant argue, would give Catch Curve the rights to technology outside the scope of its invention. Accordingly, Defendants request that the Court adopt a definition of the word "facsimile" that limits it to the protocol that defined the word at the effective filing date.

To resolve this dispute, the Court first turns to language of the claims themselves.  According to the claim language, the fax messages are transmitted by a <u>facsimile</u> machine to the SAFF.  The SAFF then forwards the fax messages to recipient <u>facsimile</u> machines.  Because the patentees claimed their invention in terms of this particular kind of transmitting machine and this particular kind of message, it is important to give meaning to these limitations in the claims.  For a machine to be a "fax" machine that sends "fax" messages, it must use a certain <u>protocol</u> - what the parties often refer to as a "digital dialogue" - to communicate.  Otherwise, nothing distinguishes these machines from any other machine used for communication.

10

1    Another component of all of the asserted claims that confirms
2  that the fax-related terms require the use of facsimile protocol is
3  the "SAFF." In the claims, the SAFF is the facility that receives
4  the fax message from the transmitting fax machine, stores it, then
5  forwards it to a recipient fax machine. Catch Curve admits that,
6  in so doing, the SAFF acts "as a proxy" for the fax machines.
7  Given that these fax machines - to be called as such - must
8  necessarily engage in the protocol unique to facsimile
9  communications - the SAFF, which simply forwards the message from
10  one fax machine to the next, must similarly engage in facsimile
11  protocol to send and receive the fax.

12    The preambles to the claims are additional intrinsic evidence
13  that the fax-related terms contemplate the use of facsimile
14  protocol. Courts determine whether a preamble limits a claim on a
15  case-by-case basis in light of "the overall form of the claim, and
16  the invention as described in the specification and illuminated in
17  the prosecution history." Allen Eng'g v. Bartell Indus., 299 F.3d
18  1336 (Fed. Cir. 2002). Although no litmus test defines when a
19  preamble limits claim scope, Catalina Mktg. Int'l, Inc. v.
20  Coolsavings.com, Inc., 289 F.3d 801, 808 (Fed. Cir. 2002), the
21  general rule is that preamble language acts as a limitation on the
22  claim when it is necessary to give life, meaning, and vitality to
23  it. Kropa v. Robie, 187 F.2d 150, 152 (CCPA 1951). Moreover, if
24  it helps to determine the scope of the patent claim, then it is
25  construed as part of the claimed invention. NTP v. Research in
26  Motion, 418 F.3d 1282, 1305 (Fed. Cir. 2005).

27    Here, Venali has requested that the Court consider the
28  preambles to the claims as additional evidence that the asserted

1  claims require the use of facsimile protocol.  The preambles to

2  claim 55 of the '926 patent and claim 24 of the '302 patent are

3  identical, describing the inventions as "a method for facilitating

4  facsimile communications between a transmitting facsimile machine

5  and at least one intended facsimile machine."  The preamble to

6  claims 30 and 48 of the '584 patent and the preamble to claim 1 of

7  the '034 patents describe the inventions as "a method for operating

8  a facsimile store and forward facility to facilitate facsimile

9  communications."  This preamble language constitutes a limitation

10  on the asserted claims because it sets forth a fundamental

11  characteristic of the invention - a system for fax machine to fax

12  machine communication.  Because the preambles help determine the

13  scope of the claims, the Court construes them as part of the

14  claimed invention.  NTP, 418 F.3d at 1305.

15      Given the foregoing, the Court finds that it is clear from the

16  language of the claims that "facsimile protocol" means the

17  standardized procedure that governs the transmitting and receiving

18  of facsimile messages, excluding other protocols whereby the

19  substance of a facsimile message is converted into a different

20  format and then retransmitted using some other protocol.  However,

21  mindful of the instruction in Phillips that "the specification is

22  always highly relevant to the claim construction analysis" and is

23  "the single best guide to the meaning of a disputed term," the

24  Court has also reviewed the specifications in this case to reach

25  this conclusion.  Phillips, 415 F.3d at 1315.

26      According to the specifications, "all fax transmissions

27  initiated by a subscriber to the fax management system are first

28  intercepted by an originator SAFF."  The SAFF then "engages the

12

1   originating machine in the same digital dialogue that would have
2   occurred if a direct connection to the destination machine had
3   actually been made . . ." thereby ". . . agreeing to accept the fax
4   format requested by the originating machine." Finally, the SAFF
5   "engages the destination machine in the necessary preliminary
6   digital dialogue."[4] This language makes clear that, at the
7   transmitting and receiving ends of the communication and at the
8   SAFF, the fax messages are transmitted and received using the
9   "digital dialogue" that is the core feature of facsimile protocol.
10  As the Federal Circuit emphasized in Phillips, "[t]he construction
11  that stays true to the claim language and most naturally aligns
12  with the patent's description of the invention will be, in the end,
13  the correct construction." Phillips, 415 F.3d at 1316.

14      Moreover, the specifications contain no indication that the
15  inventors ever considered that their patents covered anything more
16  than fax-to-fax services. The specifications make clear that the
17  scope of the invention was limited to transmission of messages over
18  a telephone line from an originating fax machine to a destination
19  fax machine, with the benefit of a store and forward facility as
20  part of the switched telephone network. ('926 patent, col. 2.)
21  The specifications emphasize that in order to receive a fax message
22  from the SAFF, the receiving device must operate using "fax mode or
23  format." ('302 patent, col. 16.) Although the specifications and
24  each of the figures address facsimile machines and computers

25
26
27  _____
28      [4]  ('926 patent, col. 6; '021 patent, col. 5.)

13

1  connected to telephone lines,[5] the specifications are devoid of any

2  reference communicating faxes using other means than facsimile

3  protocol.  This is the case because the invention was based on

4  communications between fax machines conducted over the switched

5  telephone network, not a packet switched network.

6      Finally, the Court has reviewed the file history, which also

7  confirms that the technology requires the use of fax protocol.

8  Significantly, the PTO initially rejected draft claims from the

9  '926 patent because of the existence of technology that received

10  messages in digital teletype protocols and converted those messages

11  into fax protocols so that the receiving fax machine could receive

12  the message.  However, the '926 patent was eventually approved

13  specifically because Catch Curve argued that the existing

14  technology could not "accept, process, or communicate a message

15  originating from a fax machine."  In short, Catch Curve used the

16  distinction between fax and other protocols to obtain its patents.

17  The Court construes the claims now in such a way as to render the

18  patents invalid.

19      In an attempt to persuade the Court that the claims are not

20  restricted by the use of facsimile protocol, Catch Curve makes

21  several arguments.  First, Catch Curve argues that Defendants'

22  position is inconsistent with their descriptions of their own

23  products and services.  Catch Curve points to several of

24  Defendants' advertisements describing Defendants' fax-to-e-mail

25  services as enabling customers to receive "faxes" in their e-mail

26  inboxes.  (Pl's. Reply at 7.)  Thus, Catch Curve contends, even

27

28      [5]  See discussion of "switched telephone network" infra.

14

1 Defendants recognize that a "fax" can be received through the use
2 of non-facsimile protocol.

3   The Court disagrees with Catch Curve's characterization of the
4 Defendants' advertisements - which, it notes, are the type of
5 extrinsic evidence that carries little weight in claim
6 construction.  A brief review of these advertisements reveals that
7 they do not use the term "fax" in the same way that it would have
8 been used by a person of ordinary skill in the art in question at
9 the effective filing date of these patents.  Instead, they use
10 contemporary a lay definition of "fax" that does not comport with
11 its meaning for the purpose of claim construction.

12   In further support of the idea that the patents-in-suit
13 describe fax "conversion," Catch Curve invokes the doctrine of
14 claim differentiation.  Catch Curve contends that because the term
15 "facsimile protocol" only appears in one claim - claim 69 of the
16 '021 patent - then that term must be limited to that claim.  Catch
17 Curve argues that its patents require the use of facsimile protocol
18 only with respect to the <u>transmission</u> of the fax message from the
19 transmitting fax machine to the call handling facility, i.e., the
20 SAFF, and not with respect to the <u>forwarding</u> of the fax message
21 from the SAFF to the recipient fax machine.  Thus, Catch Curve
22 argues, its claims are not limited to the use of facsimile protocol
23 unless that term is explicitly stated.

24   As an initial matter, the Court notes that the doctrine of
25 claim differentiation only applies when the failure to
26 differentiate would render a <u>claim</u> - not a limitation -
27 superfluous.  <u>Torto Co. v. White Consolidated Indus., Inc.</u>, 199
28 F.3d 1295, 1302 (Fed. Cir. 1999) (doctrine applies "[t]o the extent

15

1  that the absence of such difference in meaning and scope would make

2  a claim superfluous).  Because Catch Curve is not arguing that

3  claim 69 of the '021 patent would be superfluous if "facsimile"

4  requires the use of a facsimile protocol, the doctrine of claim

5  differentiation appears inapplicable.

6      Moreover, there is nothing in the claims to suggest that the

7  transmitting fax machine of claim 69 of the '021 patent is

8  different from the transmitting fax machine of the other asserted

9  claims.  Catch Curve's position that they are different – one uses

10 fax protocol, the other does not – violates the principle that when

11 all patents "derive from the same parent application and share many

12 common terms," the courts must "interpret the claims consistently

13 across all asserted patents."  NTP, 418 F.3d at 1293.

14     In addition, when the claims contemplate conversion from one

15 protocol to another, the claims say so.  For example, the '302

16 patent, claim 9, claims "converting facsimile message signals

17 received from said store and forward facility into suitable video

18 display signals for display on the normal television set."  The

19 '302 patent, claim 13 claims "a video display generator and RF

20 modulator means for converting facsimile messages received from a

21 store and forward facility."  Claim 34 of the '302 patent claims "a

22 conversion means for converting facsimile signals received from

23 said store and forward facility into suitable video display signals

24 for display on the normal television set."  Given that the patentee

25 was capable of specifying when a claim required conversion, it

26 follows that where no conversion is specified, none is

27 contemplated.

28 ///

16

1      Finally, in support of its position that SAFF "outbound"

2 communication need not use facsimile protocol or be transmitted on

3 a switched telephone network, Catch Curve argues that some of the

4 claims fail to recite the words "switched telephone network" to

5 limit the outbound transmission.  However, the failure to recite

6 these words in describing the outbound transmission does not

7 indicate that the inventor contemplated that this transmission

8 might take any or all forms.  The use of the word "facsimile" in

9 the same claims clearly indicates that the scope of possible

10 formats for the outbound was limited to facsimile protocol.

11      For the foregoing reasons, the Court proposes the following

12 construction of "facsimile":

13

14 **CONSTRUCTION:**  image data transmitted using facsimile protocol on

15               the switched telephone network

16

17      The Court proposes the following construction of facsimile

18 protocol:

19

20 **CONSTRUCTION:**   the standardized procedure that governs the

21                transmitting and receiving of facsimile messages

22                over the switched telephone network

23

24      B.   Fax-Related Terms

25      Having determined that the word "facsimile/fax" in the

26 asserted claims should be limited to facsimile protocol

27 communication over telephone lines, the Court now construes the

28 other fax-related terms identified by the parties.

1

2          1.   Facsimile Messages

3      Catch Curve argues that this term means "image data for

4  facsimiles."  Defendants argue that this term means either "a

5  message transmitted and received using facsimile protocol," or  "a

6  message transmitted and received over a switched telephone network

7  using facsimile protocol."

8      Under Catch Curve's litigation position, any further

9  transmission of a document that was once transmitted by a facsimile

10 machine remains a fax transmission.  This position cannot be

11 reconciled with the patents that the PTO issued.  For a fax message

12 to be a "fax" message within the meaning of the patents, it must

13 be:

14

15 **CONSTRUCTION:**  A message transmitted and received by facsimile

16              protocol

17

18          2.   Facsimile Machine

19      Catch Curve argues that the "facsimile machine"/"fax device"

20 term should be construed as "equipment for receiving or

21 transmitting facsimile messages."  Venali argues that it should be

22 construed as "a device that uses facsimile protocol to transmit and

23 receive fax messages over a telephone call," and Protus argues that

24 it should be construed as "a machine that transmits and receives

25 messages over s switched telephone network using facsimile

26 protocol."

27      For the reasons described above, Catch Curve's definition is

28 too broad.  Accordingly, the Court construes this term as follows:

18

1

2 **CONSTRUCTION:** A machine for transmitting or receiving messages

3 while using facsimile protocol

4

5 3. Paperless Facsimile Terminal Machine/Paperless

6 Facsimile Device[6]

7 In the asserted claims, "paperless facsimile terminal machine"

8 appears only in the '302 patent, claim 24, and "paperless facsimile

9 device" appears only in the '034 patent, claim 1. As the claim

10 language makes clear, this term describes the modem and specific

11 software that allow a paperless fax terminal device to emulate fax

12 terminals by using fax protocol. The '302 patent, claim 6 recites

13 a "paperless facsimile terminal machine," and the balance of the

14 claim requires a "signal modem" that can be programmed to operate

15 in "facsimile communications mode so that facsimile messages stored

16 in the subscriber's mailbox can be directly displayed on said

17 display means of the paperless facsimile terminal machine."

18 Similarly, the summary of the invention states the "so-called

19 'paperless' fax terminals" are "small portable computers equipped

20 with modems and software programs which enable them to emulate fax

21 terminals." ('034 patent, claim 4.) The summary also states that

22 "[i]n recent years, paperless fax techniques allow a computer or a

23 micro-processor equipped with specific software and modem to

24 directly transmit and receive facsimile messages." This confirms

25 that the specific software and modem allow the "paperless fax

26

27 ——————————

28 [6] The parties agree that these terms are used synonymously in the patents.

19

1 device" to emulate a fax machine by sending or receiving messages

2 over the switched telephone network using facsimile protocol.

3     Moreover, all embodiments in the '034 and '302 patent

4 specifications require a modem to enable the paperless fax device

5 to emulate a fax terminal. "Although patent claims need not be

6 limited to the preferred embodiment when the invention is more

7 broadly described, 'neither do the claims enlarge what is patented

8 beyond what the inventor has described as the invention.'" <u>Inpro</u>

9 <u>II Licensing</u>, 450 F.3d at 1350 (Fed. Cir. 2006) (citation omitted).

10 For these reasons, the Court construes this term as follows:

11

12 **CONSTRUCTION:**   A machine that emulates facsimile terminals by using

13                       facsimile protocol

14

15     C.    <u>SAFF Terms and Section 112, ¶ 6</u>

16     In certain claims, Catch Curve described its invention using

17 the means-plus-function format. <u>See</u> 35 U.S.C. § 112, ¶ 6 (allowing

18 claims to means performing a function). Such claims' scope is

19 restricted to the structures or acts described in the patent's

20 specification for performing those functions, and their

21 equivalents. <u>E.g.</u>, <u>J&M Corp. v. Harley Davidson, Inc.</u>, 269 F.3d

22 1360, 1367 (Fed. Cir. 2001).

23     If the word "means" appears in a claim associated with a

24 function, § 112, ¶ 6, presumptively applies. <u>Micro Chem, Inc. v.</u>

25 <u>Great Plains Chem Co.</u>, 194 F.3d 1250, 1257 (Fed. Cir. 1999). That

26 presumption can be overcome, but only if party presents evidence

27 that "the claim itself recites sufficient structure, material, or

28 acts to perform the claimed function." <u>Id.</u>

1    Interpreting means-plus-function claims requires first

2    identifying the claimed function and then determining the

3    corresponding structures in the specification.  Omega Engineering,

4    Inc. v. Raytek Corp., 334 F.3d 1314, 1321 (Fed. Cir. 2003).  For

5    claim construction purposes, the Court should identify as

6    corresponding structures only the specific structures actually

7    described in the specifications, as opposed to broader, but

8    undisclosed categories of such structures.  Smiths Indus. Med.

9    Systs. v. Vital Signs, Inc., 183 F.3d 1347, 1357 (Fed. Cir. 1999).

10

11           1.   "Mass Storage Means" Limitation

12    The "mass storage means" is a means for storing fax data.

13    ('926 patent, claim 55 & '302 patent, claim 24.)  This claim

14    structure tracks the format for invoking the means-plus-function

15    framework, and thus § 112, ¶ 6, presumptively applies.  Micro Chem.

16    Inc. v. Great Plains Chem. Co., 194 F.3d 1250, 1257 (Fed. Cir.

17    1999).

18    Here, the Court finds that "mass storage means" is a proper

19    mean-plus-function limitation because, while there are endless ways

20    to store information, the claim language itself provides none of

21    that structure.  Notably, other courts have treated the term

22    "storage means" as a means-plus-function limitation.  E.g., General

23    Creation LLC v. Leapfrong Enters., 232 F.Supp.2d 661, 674-78 (W.D.

24    Va. 2002).  The corresponding structure disclosed in the

25    specification is a file on a magnetic disk.  ('926 patent.)  Thus,

26    the Court finds that is the proper construction.

27    ///

28    ///

1

2. "Computer Means" Limitation

2     In the asserted claims, "computer means" is introduced as

3 means for performing a certain function, i.e.., a means for

4 controlling the store and forward facility. ('926 patent, claim

5 55; '302 patent, claim 24.) Catch Curve argues that the phrase

6 "computer means" should not be construed according to the

7 strictures of § 112, ¶ 6, because any presumption that it is a

8 means-plus-function limitation is rebutted by the word "computer,"

9 which recites a sufficiently definite structure for performing the

10 claimed function.

11     In support of this proposition, Catch Curve argues that the

12 term "computer" had a particular definition at the time that the

13 '926 patent was filed. However, the Court finds that because a

14 physical item listed has a specific definition, the structure

15 requirement is overcome. In order for the means-plus-function

16 presumption to be rebutted, the claim itself must recite sufficient

17 structure, material or acts to perform claimed function. Apex,

18 Inc., v. Raritan Computer, Inc., 325 F.3d 1364, 1371-72 (Fed. Cir.

19 2003). While every computer may have a defined structure, it does

20 not follow that every computer has structure sufficient to control

21 the operation of a store and forward facility. See WMS Gaming Inc.

22 v. Int'l Game Tech., 184 F.3d 1339, 1349 (Fed. Cir. 1999) ("in a

23 means-plus-function claim in which the disclosed structure is a

24 computer, or microprocessor, programmed to carry out an algorithm,

25 the disclosed structure is not the general purpose computer, but

26 rather the special purpose computer programmed to perform the

27 disclosed algorithm.")

28 ///

22

1        Here, Catch Curve has not met the burden of demonstrating that
2   the claims recite sufficient structure to perform the claimed
3   function of operating the store and forward facility.  Moreover
4   Catch Curve's reliance on the technical dictionary definition of
5   "computer" falls within the <u>Texas Digital</u> line of cases that is
6   disfavored post-<u>Phillips</u>.  <u>See</u> <u>generally</u> Phillips, 415 F.3d 1303,
7   1321-22.  Accordingly, the Court finds that "computer means" is a
8   means-plus-function phrase.

9

10          3.   <u>"Store and Forward Facility" Limitation</u>[7]
11        The term "store and forward facility" is not written in
12   standard "means" format and is thus presumptively not subject to
13   § 112, ¶ 6.  However, even where the words "means" or "step(s) for"
14   are absent, § 112, ¶ 6, will still apply if the claim phrase fails
15   to provide sufficient structure or acts for performing its
16   function.  <u>See</u>, <u>e.g.</u>, <u>Mas-Hamilton Group v. LaGard, Inc.</u>, 156 F.3d
17   1206, 1213-14 (Fed. Cir. 1998).  Accordingly, Defendants argue that
18   because the "SAFF" is comprised of two means-plus-function phrases
19   (computer means and mass storage means) and the claims do not
20   recite sufficiently definite structure, the "SAFF" should also be
21   construed as a means-plus-function limitation.

22        The Court finds that the means-plus-framework applies to the
23   "SAFF" because the claim term is written as a functional term and
24   has no inherent structure.[8]  The "SAFF" has numerous functions in

25

26      [7]  The SAFF is also referred to as the "call handling
    facility."  The parties have agreed that "SAFF" and "call handling
27   facility" should have identical constructions.

28

23

1  the claims, all related to receiving facsimile messages, storing
2  them, and determining when and where to transmit them.  ('926
3  patent, claim 55.)  The corresponding structure is the structure to
4  be used for performing these functions, including both the physical
5  hardware and the software required performance.

6  　　　Catch Curve again relies on the dictionary definitions of the
7  terms "facility" and "store and forward" as proof that the "SAFF"
8  has a definite structure associated with it.  However, even these
9  definitions describe the <u>function</u> of storing in more detail than
10  the <u>structure</u> that does the storing.  Given that the "SAFF" is
11  characterized by two means-plus-function terms and the claims do
12  not recite a definite structure, the Court finds that it is also a
13  means-plus-function term.  It is therefore limited to the structure
14  disclosed in the specification.

15

16  　　　D.　　<u>Switched Telephone Network</u>

17  　　　Protus requests that the Court construe the term "switched
18  telephone network" as the "circuit switched telephone network."
19  Catch Curve argues that the Court should construe the term as "a
20  system for handling telephone calls."

21  　　　As discussed above, the Court finds that the asserted claims
22  require the use of facsimile protocol - a digital dialogue over the
23  "switched telephone network."  The patents confirm that the term
24  "switched telephone network" refers to the standard worldwide
25  telephone network, and not the packet switched network used for
26  sending e-mails. (Roberts Decl. at 12.)  Moreover, the file history
27  indicates that, in trying to overcome a prior art rejection, the
28  patentee argued that "the present application and invention

24

1 presumes the existence of a switched telephone network." (Protus

2 Ex. G, at CC_P 124677.)

3      Protus requests that the Court insert the "switched telephone

4 network" term into the definition of all fax-related claims.

5 However, the Court does not believe this is necessary. When a

6 machine operates using "fax protocol," it necessarily is sending

7 fax messages over the switched telephone network. By including the

8 term "fax protocol" in the fax-related terms, the Court has already

9 complied with Protus' request.

10      Furthermore, the Court agrees with Catch Curve that Protus'

11 definition is redundant. However, the Court does not agree that

12 the "switched telephone network" term can have the broad definition

13 that Catch Curve proposes. Thus, the Court finds that the term

14 "switched telephone network" may be understood according to its

15 ordinary and customary meaning and does not require construction.

16 ///

17 ///

18 ///

19 ///

20 ///

21 ///

22 ///

23 ///

24 ///

25 ///

26 ///

27 ///

28 ///

1  E.  Terms Not Requiring Construction

2      Claim construction is a matter of resolution of disputed

3  meanings and technical scope, to clarify and when necessary to

4  explain what the patentee covered by the claims, for use in the

5  determination of infringement.  It is not an obligatory exercise in

6  redundancy.  <u>NTP</u>, 418 F.3d at 1282.  In light of the clarification

7  provided by the Court's proposed construction of the "facsimile,"

8  the Court does not deem it necessary to construe the remaining

9  disputed terms.

10

11 **V.  CONCLUSION**

12     For the foregoing reasons, the Court orders that the terms of

13 the claims in the patents-in-suit have the meanings as indicated

14 above.

15

16 IT IS SO ORDERED.

17

18

19 Dated:  _5 - 11 - 07_

20                                              DEAN D. PREGERSON
                                                United States District Judge

21

22

23

24

25

26

27

28